FILED

1    Tiffanie Williams _____ (Full Name)

2    p. box 1153 _____ (Address Line 1)

3    Apple Valley, CA   92307 (Address Line 2)

4    _____ (Phone Number)

5    Plaintiff in Pro Per

6

7

8                **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10            E D C V 2 2 - 0 1 1 9 8 - DSF (KS)

11    Tiffanie Williams _____ ,    ) **Case No.:** _____
                                      )            (To be supplied by the Clerk)
12            **Plaintiff,**          )
                                      )
13        **vs.**                     )    **Civil Rights Complaint Pursuant to**
                                      )    **42 U.S.C. § 1983 (non-prisoners)**
14    Jay Turner, Johnny Angl,        )
                                      )
15    Andrew Storie, Tony Skinner,    )    **Jury Trial Demanded:** ☒ Yes  ☐ No
                                      )
16    Michael Conner, Chase Kneeper   )
                                      )
17    Jonathan Snodgrass, Skylar Brand )
                                      )
18            **Defendant(s).**       )

19

20            *(All paragraphs and pages must be numbered.)*

21                    **I. JURISDICTION**

22    1.    This court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

23    Federal question jurisdiction arises pursuant to 42 U.S.C. § 1983.

24

25                    **II. VENUE**

26    2.    Venue is proper pursuant to 28 U.S.C. § 1391 because Plaintiff

27    resides & conducts all business within the Eastern division

28    _____

Pro Se Clinic Form                    *Page Number*

2022 JUL 11 PM 1:57

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE
BY _____

1

### III. PARTIES

2

3. Plaintiff _Tiffanie Williams_ resides at:

3
                              *(your full name)*

4 _po box 1153   apple Valley, CA 92307_

5 _____.
                              *(your address)*

6

*(You should specifically identify each Defendant you intend to sue in a separate, numbered paragraph.)*

7

8 4. Defendant _Jonathan David Snodgrass_ works at
                              *(full name of Defendant)*

9

10 _Eatn. Indiana police department_ .
                              *(Defendant's place of work)*

11                                                                        BMH
Defendant's title or position is _officer, prior town marshall, ast IU H PD_

12                              *(Defendant's title or position at place of work)*

13 This Defendant is sued in his/her (check one or both):

14    ☒ individual capacity          ☒ official capacity

15 This Defendant was acting under color of law because: _of his position with EPD_

16 _on 7.17.20 Snodgrass broke into my home w/o a warrant nor a pc._

17 _I was sexually assaulted and had my bones broke by those officers violating_

18 _18 USC 242. Then admitted he lied 4/8/22._

19 5. Defendant _Andrew Micheal Stone_ works at
                              *(full name of Defendant)*

20

21 _Eaten Police department, Gaston fire Department_ .
                              *(Defendant's place of work)*

22

23 Defendant's title or position is _officer, fire chief_ .
                              *(Defendant's title or position at place of work)*

24 This Defendant is sued in his/her (check one or both):

25    ☒ individual capacity          ☒ official capacity

26 This Defendant was acting under color of law because: _his job w/ EPD_

27 _on 7.17.20 Stone broke into my home w/o a warrant nor a pc_

28 _i was beat & sexually assaulted on BWC & home video 18USC 242_

1    3. Defendant _Micheal Conner_ works at
2    Insert ¶ #                (full name of Defendant)
3    _Eaten Police Department_ .
                    (Defendant's place of work)
4
    Defendant's title or position is _Officer_ .
5                    (Defendant's title or position at place of work)
6
7    This Defendant is sued in his/her (check one or both):
8        ☒ individual capacity          ☒ official capacity
9
    This Defendant was acting under color of law because _of his employment_
10   _with Eaten Police department, He broke into my home_
11   _without a warrant or PC. violating my 4th admendment right_
12   _verified his body cam, depositions, home survillence, violating 18 USC 242_
13   _he bide my bonos & sexually assulated me all on video._ Tw
14
15
16   4. Defendant _Jay Turner_ works at
17   Insert ¶ #                (full name of Defendant)
18   _Eaten Police Department_ .
                    (Defendant's place of work)
19
20   Defendant's title or position is _Town Marshall_ .
                    (Defendant's title or position at place of work)
21
22   This Defendant is sued in his/her (check one or both):
23       ☒ individual capacity          ☒ official capacity
24
25   This Defendant was acting under color of law because _as the town marshall_
26   _jay is on BWC instructing Stone that he w/ cover for him anything_
27   _he needs he will do. 18 USC 242_
28

Pro Se Clinic Form                    *Page Number*

5. Defendant Chase Kneeper works at
*Insert ¶ #*                    *(full name of Defendant)*

Eaton Police Department.
*(Defendant's place of work)*

Defendant's title or position is Officer.
*(Defendant's title or position at place of work)*

This Defendant is sued in his/her (check one or both):

☑ individual capacity        ☒ official capacity

This Defendant was acting under color of law because of his employment
with Eaton Police Dep Chase was not on Duty when he as my
neighbor jumped out of bed & entered my home without a
warrant nor PC & was ordered out.

6. Defendant Johnny Angel works at
*Insert ¶ #*                    *(full name of Defendant)*

Delaware County Sheriffs Office.
*(Defendant's place of work)*

Defendant's title or position is Corporal.
*(Defendant's title or position at place of work)*

This Defendant is sued in his/her (check one or both):

☑ individual capacity        ☒ official capacity

This Defendant was acting under color of law because due to his
employment w/ DCSO Johnny was called to our home due to
the break in he was shown how video Johnny told snodgrass verified
UC BWC I'm mainly worried about the entry who has that video yet
It was omitted from his report

7. Defendant _Tony Skinner_____ works at
*Insert ¶ #*                    *(full name of Defendant)*

_Delaware County Sheriff's office_____.
                    *(Defendant's place of work)*

Defendant's title or position is ___Sheriff_____.
                    *(Defendant's title or position at place of work)*

This Defendant is sued in his/her (check one or both):

        ☑ individual capacity                    ☑ official capacity

This Defendant was acting under color of law because _Of his_____
_position with the Sheriff's Office_____
_____
_____


8. Defendant _Skylor Brand_____ works at
*Insert ¶ #*                    *(full name of Defendant)*

_Eaton Police Department_____.
                    *(Defendant's place of work)*

Defendant's title or position is ___Officer_____.
                    *(Defendant's title or position at place of work)*

This Defendant is sued in his/her (check one or both):

        ☑ individual capacity                    ☑ official capacity

This Defendant was acting under color of law because _Of his    position_
_with EPD Brand told me he was going to cut the nigger_
_shit out of my head as I has braids via BWC verified_
_____

## IV. STATEMENT OF FACTS

*(Explain what happened in your own words. You do not have to cite legal authority in this section. Be specific about names, dates, and places. Explain what each Defendant did. Remember to number every paragraph.)*

1. on July 17th 2020 I heard a knock at my door I thought it was my daughter & her boy friend. I opened the door to hy whats up in a mans voice clearly not my 17yr old daughter. It startted me and I instantly slammed my door. The next thing Jonathon snodgass turned my door knob and entered my home w/o a warrant nor PC and started trying to grab me. At no point did he say I was under arrest nor that he was police or he wanted to talk to me.

2. I started screming for my husband Lanzell I went back wards w/ my hands up towards the bedroom my husband was at. All three men where pulling on me yelling but never told me what was going on. My husband exited our closed bedroom w/ a gun as we are both CCW holders. he is a vetern and more trained on weapons the a few of the officers who were in our home.

3. They contiuned to struggle w/ me and we kept telling them to get out. My husband called 911 to report the break in. I felt my wrist snap, I was pushed, shoved, arms twisted and kicked in the vagina that resualted in rips, tears and bruising. I was sexcually assulated by these men. I was taken under arrest and suffered more abuse all caught on BWC, home video, cell phone video & hospital video.

1

## VI. REQUEST FOR RELIEF

2

3   WHEREFORE, the Plaintiff requests:

4   ___. Order requiring the defendents to remove all posts
    *Insert ¶ #*

5   which contain false information about my husband & myself

6

7

8

9   ___. A judgment in an amount sufficient to compensate
10  *Insert ¶ #*

11  the plaintiff for the emotional toll & physical abuse

12  and damages sustained

13

14

15  ___. An order of reasonable attorney fees
    *Insert ¶ #*

16

17

18

19

20  ___. Punitive damages sufficient which will deter
21  *Insert ¶ #*

22  the defendant from engaging in similar conduct

23  in the future and costs of this action and all other

24  relief at law & equity that is deemed just & proper in this matter

25

26  Dated: 4/10/2022

27  Sign: _____

28  Print Name: Tiffanie Williams

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby requests a jury trial on all issues raised in this complaint.

Dated: 7/10/2022

Sign:

Print Name: Tffanie Williams

## FACTS

1. On or about July 10th, 2020, a protective order was issued under cause number 18C03-2007-PO-000386 protecting Jayda Williams from Tiffany (sic) Williams.

2. On or about July 17th, 2020 Jayda Williams called in a complaint to the Eaton Police Department alleging that Tiffany Williams had violated the protective order.

3. Officer Snodgrass of the Eaton police department was the lead officer for the complaint with Officer Storie and Officer Conner assisting initially.

4. Jayda Williams, who resided at 715 E. Race St, Apartment #3 advised officers that Tiffanie Williams lived in the shared apartment complex in unit #12 and that she had made hateful statements about Jayda Williams to Jayda's mother, Brittany Sparks.

5.    Officers did not personally witness the alleged "Invasion of Privacy" and did not
      see Tiffanie Williams outside of her residence before encountering her on July
      17th, 2020.

6.    Officers did not seek any confirmation that the protective order issued under
      18C03-2007-PO-000386 had been served before confronting Tiffanie Williams.
      Officers did ask Jayda Williams and Brittany Sparks to write out statements but
      the statements failed to identify exactly when the alleged incident occurred.

7.    Officers went to Unit #12 and knocked on the door.   A woman, known to
      officers as Tiffanie Williams, opened the door and closed the door flush with
      the frame before Officer Snodgrass could finish saying "Hey. What's up?".

8.    Officer Snodgrass turned the doorknob and entered the home of Tiffanie and
      Lanzell Williams with two accompanying officers.   No warrant was obtained
      prior to entering the Williams' residence.   In his probable cause affidavit, Officer
      Snodgrass stated his actions were appropriate under the theory of "hot pursuit".

9.    While the officers were wearing police uniforms, they did not initially announce
      that they were police nor state they had probable cause before they entered the
      home and grabbed Tiffanie Williams.

10.   Tiffanie Williams began screaming and yelling for her husband, Lanzell
      Williams, who was in a back room of the home.

11.   Lanzell Williams, upon hearing the commotion, came to the hallway with what
      appeared to be a firearm in his hand.

12.   Both Tiffanie Williams and Lanzell Williams ordered law enforcement out of the
      house and complained that they did not have a warrant.

13.  Officers ordered Lanzell Williams to "put the gun down".   Officers believe they

saw Lanzell Williams pointing a firearm at them.   Body camera footage

captures video of  Lanzell Williams with what appears to be a firearm in his right

hand pointing at the ground with his right arm down by his side.   Tiffanie

Williams yelled at Lanzell Williams to "get her phone" to record the incident.

14.   Lanzell Willaims disappeared briefly and reappeared with two cell phones but no

firearm.

15.  Lanzell Williams was permitted by officers to walk into other rooms, and in and

out of the residence, and even behind officers, unencumbered for a majority of the

time as he recorded them on one phone and called Delaware County dispatch on

another phone.   Despite officers later filing felony charges against Lanzell

Williams for pointing a firearm, not one officer initially detained Lanzell

Williams nor did they secure the instrumentality of the alleged threat.   The

alleged firearm was never recovered by officers.

16.  Officers arrested Tiffanie Williams and Lanzell Williams returned to the

exclusive use of his residence.   Almost one hour after the police first encountered

Lanzell Williams, they knocked on his door.   When Lanzell Williams opened his

door, he was seized by law enforcement and pulled outside of his home without

incident.

17.  Lanzell was arrested and charged with Intimidation as a Level 5 Felony and

Pointing a Firearm as a Level 6 Felony.

## V. CLAIMS

### Claim #1

____.    Plaintiff realleges and incorporates by reference all of the paragraphs above.
*Insert ¶ #*

____.    Plaintiff has a claim under 42 U.S.C. §1983 for violation of the following
*Insert ¶ #* federal constitutional or statutory civil right:

My 4th amendment right for warrantless entry. My 8th for
stacking excessive bail. My 1st for gag order, & 4th amendment
for falsifing documents of police reports/records.

____.    The above civil right was violated by the following Defendants:
*Insert ¶ #*

Jonathan Snodgrass, Andrew Storie, Michael Conner, Chase
Kneeper, Jay Turner, Johnny Angel, Skyler Brand, Tony
Skinner

*(You may list facts supporting your claim. Be specific about how each Defendant violated this particular civil right.)*

____.    My 4th amendment right for warrantless entry.
*Insert ¶ #*
Jonathan Snodgrass w/o a warrant turned my doorknob on a
closed door lifted his knee put all his weight into it & open my door
w/ force striking me. They other officers followed started grabbing
me, my breasts, my harms, pulling me, pushing me, Snodgrass
lied on PC said I bit M.conner never did per Conner but stacked
my charges. My 1st by all I was denied my right to speak and
they placed a gag order on me. Told me I couldn't even go to therapy

____.    As a result of the Defendant's violation of the above civil right, Plaintiff
*Insert ¶ #* was harmed in the following way:

My wrist was broke in 2 places. I was sexually assalted
w/ tears, rips & bruising in my privates. I suffer terribly
with PTSD medically Documented. Its unexplainable whats
been done to us  as whistle blowers

Pro Se Clinic Form                         *Page Number*

1

## Claim #(2)

2

*(insert Claim#)*

3  ___. Plaintiff realleges and incorporates by reference all of the paragraphs above.

*Insert ¶ #*

4  *(List any other legal claim you have that is related to your civil rights claim.)*

5  ___. Intentional infliction of Emotional Distress
*Insert ¶ #*

6  Miller U Cent. Ind. cnty found Inc. ind appt CT 2014

7  identifies the four Element to the test of intentional infliction

8  of Emotional distress as a defendant engages in extreme and outrageous

9  conduct that intentionally or recklessly cause severe emotional

10 distress to another. Defendant behavior has gone far beyond any
   tolerated by a decent society

11 ___. Plaintiff alleges the above claim against the following Defendant(s):
*Insert ¶ #*

12 Jonathan Snodgrass, Andrew Storie, Jay Turner, Johnny Angel,

13 Tony Skinner, Skylar Brand, Chase Kneeper, Micheal Connor

14

15

16  *(You may list facts supporting your claim. Be specific about how each Defendant*
     *violated the rights giving rise to this claim.)*

17 ___. All defendants have caused intentional infliction of
*Insert ¶ #*

18 Emotional Distress. They have the same body cam footage and

19 reports they are aware they lied May 2nd 2022 Jonathan

20 Snodgrass admitted on stand they lied that he did break into

21 our home.

22

23

24

25 ___. As a result of the Defendant's violation of the rights giving rise to this
*Insert ¶ #* claim, Plaintiff was harmed in the following way:

26 Ive lost everything, I live in hiding, I have Dx PTSD.

27 I was threatened to be killed by andrew Stories

28 father if I didnt drop the case

## ARGUMENT

### A.    Officers lacked probable cause to arrest Tiffanie Williams

Generally, under Indiana Code § 35-33-1-1, officers would not be allowed to make a

warrantless arrest for a misdemeanor that was not committed within their presence.  However,

that same code section provides exceptions.   For instance, officers may make an arrest if they

have probable cause to believe someone has committed the crime of "Invasion of Privacy".

(See I.C. 35-33-1-1(a)(6)).

"Probable cause exists when, at the time of the arrest, the arresting officer has knowledge

of facts and circumstances that would warrant a person of reasonable caution to believe that the

suspect had committed a criminal act.  The amount of evidence necessary to meet the probable

cause requirement is determined on a case-by-case basis. The facts and circumstances need not

relate to the same crime with which the suspect is ultimately charged." *Winebrenner v. State*,

790 N.E.2d 1037, 1040, (Ind. App. 2003) citing to *Ortiz v. State*, 716 N.E.2d 345, 348 (Ind.

1999).

The paramount issue in this case is whether officers had probable cause at the time of her

arrest to believe Tiffanie Williams committed the crime of "invasion of privacy".   Therefore, it

is important to determine what officers knew and when they knew it.

A person who knowingly or intentionally violates a protective order commits "invasion

of privacy", a class A misdemeanor.  Ind. Code § 35-46-1-15.1(a)   In order to violate a

protective order, knowingly or voluntary, the person must have knowledge of the order.   The

statutes defining the crime of invasion of privacy "do not require actual service of a protective

order for a conviction but the state still must prove that the person knowingly or intentionally

violated the order.   Ind. Code § 35-46-1-15.1, *Joslyn v. State*, 942 N.E.2d 809, 811-812, (Ind.

2011).

In order for the alleged conduct to violate the protective order, there must be some

indication that Tiffanie Williams was aware of the protective order *before the conduct* even if the

officer is not aware of "actual service".

Officers failed to form probable cause that a crime occurred based upon the following

facts:

1.      Officers did not know Jayda Williams or Brittany Sparks and therefore did not

know if they were credible witnesses.  Officers failed to corroborate any portion of the

allegations against Tiffanie Williams prior arresting her.   Neither Jayda nor Brittany were

certain if Tiffanie had been served.

2.      Officers failed to clarify that the "Tiffanie Williams" who lived in Apartment 12

was the same person as "Tiffany Williams" who was listed on the protective order given to them

by dispatch.

3.      The report given to officers by dispatch indicates that a protective order was

issued on July 10th, 2020 but does not tell officers that the order had been served.

4.       Officers took no steps to verify the service of the protective order prior to

arresting Tiffanie Williams.

       a.      Officers did not contact the Delaware County Sheriff to check for service.

       b.      Officers did not check the Incite database to check for service.

       c.      Officers did not check with dispatch to check for service.

       d.      Officers had no personal knowledge of service upon Tiffanie Williams.

5.      Even if Tiffanie Williams had knowledge of the protective order, there is no clear evidence from the alleged victims of whether the alleged misconduct occurred before or after the protective order was served and officers did not ask any relevant follow up questions to clarify the information.   Officers did not question the witnesses to find out the date or time of the alleged misconduct.

Based upon these factors, officers needed more information before they could formulate probable cause to arrest Tiffanie Williams.

### B.      No "hot pursuit" to justify a Constitutional violation

Even if officers had probable cause to arrest Tiffanie Williams, their entry into the Williams' home to effectuate the arrest was improper.  Both the Fourth Amendment of the U.S. Constitution and Article 1, § 11 of the Indiana Constitution protect citizens against unreasonable search or seizure. "'The purpose of Article [I], § 11 is to protect from unreasonable police activity, those areas of life that Hoosiers regard as private.' In determining whether the police behavior was reasonable under Section 11, the Court must consider each case on its own facts and construe the constitutional provision liberally so as to guarantee the rights of people against unreasonable searches and seizures. 'Houses and premises of citizens receive the highest protection.' The burden is placed on the State to show that under the totality of the circumstances, the police officers' intrusion was reasonable." *Willis v. State*, 780 N.E.2d 423, 427-428, (Ind. App., 2002). (*citations omitted*). Generally, warrantless searches and seizures inside a home are presumptively unreasonable. *Id.* citing to *Krise v. State*, 746 N.E.2d 957, 961 (Ind. 2001).

In this matter, Officer Snodgrass indicates in his probable cause affidavit that his

warrantless entrance to the Williams' residence was justified under a theory of "fresh pursuit".

The doctrine of "Fresh Pursuit" extends arrest authority to law enforcement from another state

pursuing a felon into Indiana.    See Ind. Code 35-33-3 et. seq.    Based upon the doctrine's

inapplicability to this case, it is assumed that Officer Snodgrass is referring to "hot pursuit" or

some other exigent circumstance.

> "The principal protection against unnecessary intrusions into private dwellings is the
> warrant requirement imposed by the Fourth Amendment on agents of the
> government who seek to enter a residence for purposes of search or arrest.  Accordingly,
> searches and seizures inside a home without a warrant are presumptively
> unreasonable. However, public interest occasionally demands greater flexibility than
> is offered by the warrant requirement, and, as such, certain exceptions to it
> exist.  Termed exigent circumstances, such have been found (1) where a suspect is
> fleeing or likely to take flight in order to avoid arrest; (2) where incriminating
> evidence is in jeopardy of being destroyed or removed unless an immediate arrest is
> made; (3) where a violent crime has occurred and entry by police can be justified as
> means to prevent further injury or to aid those who have been injured; and (4) in cases
> that involve hot pursuit or movable vehicles.  The State bears the burden of
> demonstrating that exigent circumstances existed in order to overcome the presumption
> of unreasonableness that accompanies all warrantless home entries." *Alspach v.
> State*, 755 N.E.2d 209, 212, (Ind. App. 2001) (citations omitted.)

Officer Snodgrass appeared at the Williams' home with two other officers.    The

Williams' residence has a window and/or door on only two sides of the four-sided residence.

Therefore, the home could be completely covered by two officers while the third secured a

warrant.   Officers did not follow Tiffanie from the "scene of the crime" or chase her into her

home as she was evading arrest.    While Tiffanie Williams closed the door immediately upon

seeing the officers, there was no indication that she was actually fleeing the residence and would

not be still in the house when a warrant was secured.    As Mrs. Williams articulated to the

officers entering her home, she has the right to close her door.

"Officers who are not armed with a warrant may knock on a door and request to speak with an occupant. This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. During such an occurrence, 'the occupant has no obligation to open the door or to speak." Conduct that occurs on one's curtilage that is beyond a traditional 'knock and talk' is subject to Fourth Amendment protection'." *J.K. v. State*, 8 N.E.3d 222, 229, (Ind. App. 2014) (citations omitted).

"In response to a "knock and talk" residents have the right to deny officers admission and to refuse to answer questions. If residents exercise this right, officers generally must leave and secure a warrant if they want to pursue the matter." *Hardister v. State*, 849 N.E.2d 563, 570, (Ind. 2006) citing to *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000); *Cox v. State*, 696 N.E.2d 853, 858 (Ind. 1998).

Mrs. Williams had the right to close the door and refuse to answer any questions. She had not been advised that she was under arrest or that officers were there for any official business. This conduct does not constitute "fleeing" nor is it any form of "hot pursuit" when Mrs. Williams was already in her residence when the alleged "pursuit" began. The idea of hot pursuit is to prevent suspects from claiming a "free home base" when being chased by law enforcement. It does not include a citizen closing a door rather than being questioned by law enforcement.

**C.      Officers' arrest of Lanzell also required a warrant**

Despite failing to make an arrest for an hour and allowing Lanzell to walk around freely with a possible weapon, officers stated that Lanzell Williams pointed a firearm at them.   Such an act could constitute a felony in Indiana.   "While in most cases, probable cause to believe the person being arrested committed a felony is sufficient to support a warrantless arrest, '[p]robable cause alone is insufficient to justify a warrantless arrest of a person in his home.' Instead, there must also be exigent circumstances present, which are traditionally found where '1) a suspect is fleeing or likely to take flight in order to avoid arrest; 2) incriminating evidence is in jeopardy of being destroyed or removed unless an immediate arrest is made; and 3) in cases that involve hot pursuit or movable vehicles'." *Shorter v. State*, 151 N.E.3d 296, 302, (Ind App. 2020) citing to *Snellgrove v. State*, 569 N.E.2d 337, 340 (Ind. 1991).

Lanzell Williams was still in his home when officers reached across the threshold and pulled him out of the residence.   There was no "hot pursuit" or fleeing.   The actions of the officers constitute an improper warrantless seizure in violation of both the Federal Bill of Rights and the Indiana Constitution.

**D.      Officers' warrantless entry was unreasonable under Article I, Section 11**

"Despite the fact that the text of Article I, Section 11 is nearly identical to the Fourth Amendment, Indiana courts interpret and apply it independently from federal Fourth Amendment jurisprudence.   In resolving challenges asserting this section, courts must consider the circumstances presented in each case to determine 'whether the police behavior was reasonable.' We require the State to 'bear the burden of showing that, in the totality of the circumstances, the intrusion was reasonable.'" *Winebrenner* at 1041 (Citations omitted).

**In The Matter Of:**

*STATE OF INDIANA V.*

*LANZELL WILLIAMS, III*

---

*ANDREW STORIE*

*April 8, 2022*

---

*ACCURATE REPORTING OF INDIANA*

*543 PONDS POINTE DRIVE*

*CARMEL, INDIANA 46032*

*317.848.0088*

*accuratereportingofindiana@gmail.com*

Original File 04082022 STORIE.txt

Min-U-Script® with Word Index

STATE OF INDIANA V.
LANZELL WILLIAMS, III

ANDREW STORIE
April 8, 2022

**Page 1**

```
1   STATE OF INDIANA
2   COUNTY OF DELAWARE
3
4
5            IN THE DELAWARE COUNTY CIRCUIT COURT 1
6               CAUSE NO. 18C01-2007-F5-000116
7
8
9   STATE OF INDIANA,
                      Plaintiff,
10          vs.
11  LANZELL WILLIAMS, III,
                      Defendant.
12
13          The oral deposition of
14
15              ANDREW STORIE,
16
17          was taken by counsel for the defendant on
18  the 8th day of APRIL, 2022, at 3100 South Tillotson
19  Avenue, Suite 270, Muncie, Indiana, and reported by me,
20  Marjorie A. Addington, Notary Public in and for the
21  County of Hamilton, State of Indiana, CM, CSR.
22
23          ACCURATE REPORTING OF INDIANA, LLC
24              543 PONDS POINTE DRIVE
                CARMEL, INDIANA 46032
25                 (317) 848-0088
```

**Page 2**

```
1                APPEARANCES
2
3   FOR THE PLAINTIFF:
4
5   Mr. Steve Sneed
    Delaware County Prosecutor's Office
6   3100 South Tillotson Avenue
    Suite 270
7   Muncie, Indiana  47302
8
9   FOR THE DEFENDANT:
10
11  Mr. David M. Seiter
12  Riley Cate, LLC
    11 Municipal Drive
13  Suite 320
    Fishers, Indiana 46038
14
15             I N D E X
16
17
18  Direct Examination by Mr. Seiter-Page 3
19
20
21
22
23
24
25
```

**Page 3**

```
1          (Witness is sworn at 2:05 p.m.)
2
3   DIRECT EXAMINATION BY MR. SEITER:
4   Q.  Sir, would you please state your name for the
5   record?
6   A.  Andrew Storie.
7   Q.  And do you go by "Andrew," "Officer Storie," "Mr.
8   Storie," how would you like to be addressed?
9   A.  "Andrew" is fine.
10  Q.  All right, and have you ever been deposed before?
11  A.  Been what?
12  Q.  Have you ever been deposed before, been through a
13  deposition?
14  A.  Yes.
15  Q.  Okay, I figured you had because of your
16  profession.  Let me introduce myself, my name is Dave
17  Seiter, I'm an attorney and I'm representing Lanzell
18  Williams.  I do not represent Tiffanie, I only
19  represent Lanzell.
20  A.  Okay.
21  Q.  There are a couple rules that I want to go over
22  with you.  First of all it's important to give clear
23  answers, so if you shake your head or answer "uh-huh"
24  or "uh-uh" I may ask you to clarify.  It's important
25  that we don't interrupt each other because then we get
```

**Page 4**

```
1   dirty looks from the court reporter, so I'll give you
2   a chance to get your entire answer out and you
3   probably know where I'm going with my questions but
4   let me get my entire question out.  If you need to
5   take a break at any time you're free to do so, get
6   water, go use the bathroom, talk to the prosecutor,
7   whatever you want to do, I just ask that you answer
8   the last question posed to you before we take a break.
9   A.  Okay.
10  Q.  And finally, despite doing this for a living, I
11  don't always ask the best questions, so if I ask you a
12  question that you don't understand, please ask me to
13  either rephrase it or repeat it.  If you answer the
14  question I'm going to assume that you heard me, that
15  you understood the question and that you answered it
16  honestly, is that fair?
17  A.  Yes.
18  Q.  Have you reviewed anything prior to your
19  deposition today?
20  A.  Yes, I have.
21  Q.  Okay, and what have you reviewed?
22  A.  I've reviewed my supplement and I also reviewed
23  my body camera footage.
24  Q.  Okay.  Did you review anyone else's body camera
25  footage?
```

STATE OF INDIANA V.
LANZELL WILLIAMS, III

ANDREW STORIE
April 8, 2022

Page 5

1  A.  I did not.
2  Q.  Okay.  I notice you have some documents in front
3       of you, is that your report?
4  A.  Yes.
5  Q.  Okay.  I'm going to ask you a question.  If you
6       need to refer to your report at any time you can, I
7       just want to make a record that that's what you're
8       doing.
9  A.  Okay.
10 Q.  Are you employed, sir?
11 A.  Yes, sir.
12 Q.  Where are you currently employed?
13 A.  Eaton Police Department.
14 Q.  All right, and how long have you worked there?
15 A.  Full-time just over four years.
16 Q.  And were you so employed on July 17th of 2020?
17 A.  Yes.
18 Q.  And did you complete an academy?
19 A.  Yes.
20 Q.  All right, when and where?
21 A.  The Indiana Law Enforcement Academy Tier 1, I
22      graduated in January of 2019.
23 Q.  Was Tony Gregory one of your instructors?
24 A.  Who?
25 Q.  Tony Gregory, on use of force?

Page 6

1  A.  I don't know, to be honest with you.
2  Q.  Did they teach you about constitutional
3       principles?
4  A.  I can't recall that.
5  Q.  All right.  Did they teach you about warrant
6       procedures?
7  A.  Yes.
8  Q.  And do you receive supplemental training through
9       your department?
10 A.  Yes.
11 Q.  All right.  Do you learn about the constitution
12      through any of your department training?
13 A.  Yes.
14 Q.  Do you learn about warrant procedures through
15      your department training?
16 A.  I'm going to say yes.
17 Q.  It's not a trick question, they tell you how to
18      get a warrant if you need one, right?
19 A.  Sure, yes.
20 Q.  All right, and you prepared a report as to what
21      happened on that day, is that correct?
22 A.  Yes.
23 Q.  And is the information accurate?
24 A.  Yes.
25 Q.  Are there any false statements that you put in

Page 7

1       your report?
2  A.  No.
3  Q.  And does it also jibe with your body-worn camera
4       footage that you took?
5  A.  Yes.
6  Q.  All right.  I'm going to turn your attention to
7       July 17th of 2020.  On that date did you respond to a
8       complaint from a Jayda Williams?
9  A.  Yes.
10 Q.  Did you know Jayda Williams before this date?
11 A.  I did not.
12 Q.  Do you know if she's ever made complaints before?
13 A.  To my knowledge, no.
14 Q.  Okay, so you don't know if she's reliable as a
15      witness or not?
16 A.  At that time, no, I had never had any
17      interactions with her.
18 Q.  All right, how about Brittney Sparks?
19 A.  Same thing, I have never had any interactions
20      with her as well.
21 Q.  Okay.  Prior to July 17, 2020 did you know
22      Tiffanie Williams?
23 A.  Yes.
24 Q.  And had you formed an opinion about her mental
25      status?

Page 8

1  A.  I have had a few interactions with her.  There
2       was interactions involving our police department that
3       I was not personally involved with but we were made
4       privy of that information where her husband, Lanzell,
5       had came and asked for guns to be removed from the
6       residence because she had suicidal tendencies, he
7       thought she was going to kill herself.  She was in the
8       mental ward at Ball Hospital.  My deputy chief now, he
9       wasn't deputy chief at the time, actually took her
10      from there to jail for a warrant, so with the
11      information that was told to me by the officers above
12      me, my chief, that there was some mental deficit
13      issues there.
14 Q.  Okay, so had the guns been seized from her or
15      not?
16 A.  I wasn't involved with that.
17 Q.  All right, and did you form any opinion as to
18      what you believe her mental status to be?
19 A.  From the one interaction that I solely had with
20      her, no.
21 Q.  All right, and did you know Lanzell Williams
22      before July 17, 2020?
23 A.  The one interaction I had with Tiffanie Lanzell
24      was outside but I don't recall if I had any
25      interaction as far as conversations with him.

STATE OF INDIANA V.                                          ANDREW STORIE
LANZELL WILLIAMS, III                                            April 8, 2022

---

Page 9

1  Q.  Okay.  Did you know his criminal history or
2     anything?
3  A.  I did not.
4  Q.  All right.  Do you know if he had a valid gun
5     permit?
6  A.  I do not.
7  Q.  And you were with Officer Snodgrass when you
8     talked to Jayda Williams and Brittney Sparks?
9  A.  I came in, he was already there.  I was
10    originally dispatched to deal with this issue.  I was
11    called to Jay County to assist with a k9 for a
12    pursuit, so at that point I was the only officer.
13    Officer Conner put me on duty.  There was no other
14    officers on duty.  Officer Snodgrass come on duty at 6
15    o'clock.  When Officer Snodgrass was dispatched to it,
16    I proceeded to the residence but he was there several
17    minutes prior to me.
18  Q.  Okay.  I'm going to show you what we marked in
19    Officer Snodgrass's deposition as Defendant's Exhibit
20    C.  Do you recognize what that document is?
21  A.  This appears to be notes that would be on our CAD
22    system.
23  Q.  Okay, and is that the information that you
24    received regarding the run?
25  A.  I can't -- That incident was almost two years

---

Page 10

1  ago, I don't recall that.
2  Q.  Understand.  Do you know where you would receive
3     any other information other than what's on this
4     report?
5  A.  Can you clarify your question?
6  Q.  Sure.  We understand that this CAD was probably
7     made available to you when you went to the run,
8     correct?
9  A.  Correct.
10  Q.  You could see that on your computer in your
11    vehicle?
12  A.  Again that was two years ago, I can't say "yes"
13    or "no" definitively.
14  Q.  Fair enough.  Did you know about a protective
15    order that had been issued against a Tiffanie Williams
16    by a Jayda Williams?
17  A.  I believe when we were, if I remember correctly,
18    when we were dispatched to the incident they had
19    advised that it was a violation of a protective order
20    that was already in place, that's all the information
21    I had.
22  Q.  Did you ever confirm to see whether or not that
23    protective order was in place prior to confronting
24    Tiffanie Williams?
25  A.  I did not.

---

Page 11

1  Q.  Okay.  Did you check to see if any protective
2     order had been served against Tiffanie Williams prior
3     to encountering Tiffanie Williams?
4  A.  I'd like to explain a little bit more to that --
5  Q.  Sure.
6  A.  -- answer.
7  Q.  Please do.
8  A.  I was not the officer that assigned this call, so
9     it was essentially I was there as an assisting
10    officer, so that wasn't kind of my place to do that.
11  Q.  Okay, so basically you're there providing
12    additional security resources, that type of thing?
13  A.  Yes.
14  Q.  All right, and so your answer would be no, that
15    you did not check to see if that warrant had been
16    served?
17  A.  I did not check.
18  Q.  All right.  Did you do anything to verify Jayda
19    Williams' complaint that there had been an invasion of
20    privacy, did you do any investigation whatsoever?
21  A.  I personally, no.
22  Q.  So you personally would not have probable cause
23    to believe that a crime had occurred if you had done
24    no investigation?
25  A.  Not necessarily, but I was not the officer

---

Page 12

1  handling it.
2  Q.  Okay.  Did you feel that you had probable cause
3     to go arrest Tiffanie Williams at that moment?
4  A.  I had not read through the statements, I had not
5     heard everything going on.  Like I said, I got there
6     halfway through it.
7  Q.  Understood.  It's okay to say "no" if you didn't.
8  A.  Well, I'm trying to explain.  As I explained in
9     my supplement, Officer Snodgrass stated that that
10    information was there and there was enough to arrest
11    her.
12  Q.  Okay, but you didn't review --
13  A.  I personally, me, no.
14  Q.  So your belief that you had probable cause was
15    based on what you believe Officer Snodgrass had but
16    you didn't do any independent verification, is that a
17    fair statement?
18  A.  Correct.
19  Q.  Okay, and you did not check the Insight database
20    or contact the sheriff's department or anything like
21    that to find out if the warrant had been served?
22  A.  I did not.
23  Q.  Okay, and you went to Tiffanie's door with
24    Officer Snodgrass?
25  A.  Yes.

---

STATE OF INDIANA V.
LANZELL WILLIAMS, III

ANDREW STORIE
April 8, 2022

---

Page 13

1  Q.  All right, and is it a solid door?
2  A.  I can't answer whether it was a solid or hard-
3  core door.
4  Q.  Okay, fair enough.  My question is did it have
5  any windows in it?
6  A.  It did not.
7  Q.  Did it have a peephole in it?
8  A.  I can't recall that.
9  Q.  Okay, there's no screen door?
10  A.  No.
11  Q.  So once you open the door it's open to anybody
12  coming in?
13  A.  Yes.
14  Q.  All right.  Did you have a warrant to go into the
15  home of Tiffanie and Lanzell Williams?
16  A.  We did not.
17  Q.  And so when she opened the door and Officer
18  Snodgrass went in, what did you believe to be the
19  basis for being in the house at that time?
20  A.  We had probable cause, according to what he had
21  advised me, we had probable cause for her arrest.
22  Q.  Okay, for what charge?
23  A.  Violation of a protective order.
24  Q.  So invasion of privacy?
25  A.  Yes.

---

Page 14

1  Q.  Okay.  How many sides of Tiffanie's apartment had
2  either a door or a window?
3  A.  I'm not 100 percent sure as a total.  I think
4  there's only one door, but I'm not 100 percent sure.
5  Q.  All right, so let's start with the door that you
6  went in that you entered.
7  A.  Uh-huh.
8  Q.  So obviously that side had a door and a window,
9  is that correct?
10  A.  Yes.
11  Q.  All right, and we know that to the left of that
12  there's another apartment that is up against that
13  shared wall, is that correct?
14  A.  I believe so.
15  Q.  So there's no door or window on that wall?
16  A.  I can't recall that.
17  Q.  Okay.  Do you remember if there were windows or
18  doors in the back of the house?
19  A.  I can't recall that.  I don't --
20  Q.  All right.
21  A.  -- believe I walked around the back to look.
22  Q.  And then the end of that building do you agree
23  that there's no doors or windows on the side, the end
24  of the entire building, the side of the apartment?
25  A.  I don't believe so.

---

Page 15

1  Q.  Okay, so an officer could cover the front and an
2  officer could cover the back and all the doors and
3  windows would be covered, correct?
4  A.  I would say so, yes.
5  Q.  All right, and how many officers were present at
6  the time you knocked on the door to Tiffanie Williams'
7  apartment?
8  A.  Three.
9  Q.  Okay.  Is there any reason why a warrant could
10  not have been obtained prior to going into her house?
11  A.  I'm sure there probably could've been.
12  Q.  Okay.  Was there any discussion about whether a
13  warrant should've been obtained?
14  A.  No, there was not.
15  Q.  We knew that the victims were not in Tiffanie's
16  house because you just left their house, right?
17  A.  Yes.
18  Q.  And there wouldn't be any evidence to be
19  destroyed from an invasion of privacy charge, right,
20  it's not like a --
21  A.  No.
22  Q.  -- drug case where somebody's flushing something
23  down the toilet?
24  A.  No.
25  Q.  Okay.  Other than your uniform did you do

---

Page 16

1  anything else to announce that you were the police
2  when you entered the house?
3  A.  I did not.
4  Q.  Did you hear any of the other officers announce
5  that they were the police?
6  A.  I cannot recall.
7  Q.  Do you recall Tiffanie yelling and screaming and
8  ordering you out of her house?
9  A.  Yes.
10  Q.  Did she call for her husband Lanzell?
11  A.  Yes, she did.
12  Q.  Did Lanzell come into the room where you were?
13  A.  No.
14  Q.  Okay.  Did he come into the hallway leading into
15  the room where you were?
16  A.  Yes.
17  Q.  All right, and describe that moment for me.
18  A.  Ms. Williams was running towards the hallway,
19  Officer Snodgrass was trying to grab ahold of her
20  advising her -- I can't remember exactly what he was
21  saying but he was trying to tell her to stop.  I was
22  behind him.  She was screaming for Lanzell.  Lanzell
23  came out in the hallway and pointed a firearm at
24  Officer Snodgrass's head, yelling at both of us,
25  yelling at all of us, and then turned the firearm and

---

STATE OF INDIANA V.
LANZELL WILLIAMS, III

ANDREW STORIE
April 8, 2022

---

Page 17

1  pointed it at me.
2  Q.  Okay.  How many seconds did he have it pointed at
3  Snodgrass?
4  A.  I don't have an accurate number for that, it felt
5  like an eternity, to be honest with you.
6  Q.  Okay, felt like an eternity because it scared
7  you?
8  A.  I've never had a firearm pointed at my direction
9  with somebody else having a finger behind a trigger
10  not knowing what their intentions were, --
11  Q.  Sure.
12  A.  -- that was my first time.
13  Q.  Okay, so in the training academy aren't you
14  trained to go to the nearest threat?
15  A.  Yes.
16  Q.  The gun would be the threat, wouldn't it?
17  A.  It would.
18  Q.  So did any of the officers detain Lanzell to take
19  the gun out of his hand?
20  A.  No, they did not.
21  Q.  Did any of the officers draw their own weapons to
22  get him to put his gun down?
23  A.  No.
24  Q.  He pretty quickly put the gun down at his side,
25  didn't he?

---

Page 18

1  A.  I wouldn't say "quickly."
2  Q.  Well, he --
3  A.  He was able to point it at Officer Snodgrass and
4  hold it towards him and then pointed it at myself and
5  I was able to stare at the gun long enough to see what
6  it looked like.
7  Q.  Is any of that captured on video?
8  A.  It should be, yes.
9  Q.  On your video or someone else's?
10  A.  My video, as I said, I have not reviewed.
11  Officer Snodgrass's body cam I have not reviewed or
12  Officer Conner's body cam.  I've only reviewed my own.
13  Q.  I will show you yours in a moment.  Let's go
14  ahead and look at Officer Snodgrass's.  Are you able
15  to see that okay?
16  A.  Yes.
17  Q.  Okay, and this is -- I'm starting the video at
18  22:25:16.  This is going to be right before she opens
19  the door.
20  A.  Okay.
21  (Video plays.)
22  Q.  And if you need me to pause, just tell me to
23  pause and I can back it up.
24  A.  Okay.
25  (Video plays.)

---

Page 19

1  Q.  So I'm going to stop the video right there at
2  22:25:55.  At this point have you heard anybody
3  announce that they're police or that she's under
4  arrest or that they have probable cause to do
5  anything?
6  A.  At this point in the video, no.
7  Q.  Okay, I'm going to continue playing it.
8  (Video plays.)
9  Q.  Whose voice is that that we are coming on the
10  camera and I stopped the video at 22:26:01?
11  A.  Lanzell's.
12  Q.  So prior to Lanzell coming out of his room and
13  confronting you nobody had announced "Police, you're
14  under arrest, we have probable cause," none of that
15  language?
16  A.  Announced it verbally, no.
17  Q.  Okay, how else would you announce it?
18  A.  I would say us all being in full uniform is
19  enough to realize that we're the police.
20  Q.  Okay.  Have you ever read criminal reports of
21  people dressing like police and doing home invasions?
22  A.  Not around our area, no.
23  Q.  Okay, but it has happened around the country?
24  A.  Sure.
25  Q.  Okay.

---

Page 20

1  (Video plays.)
2  Q.  All right, I'm pausing the video at 22:26:09.  Is
3  that you that I see in the screen?
4  A.  Yes.
5  Q.  All right, and you give him a command to drop the
6  gun?
7  A.  Correct.
8  Q.  All right, and it looked like there was a finger
9  that came up here, was that his?
10  A.  Can you back it up?
11  Q.  Sure, I'll back it up.  There's a 10-second
12  reverse here.
13  (Video plays.)
14  Q.  Did you see that finger?
15  A.  I did.
16  Q.  Okay, and that is at 22:26:10 where I paused it
17  right now, so just slightly before that, right?
18  A.  Yeah, I --
19  Q.  Okay.
20  A.  -- believe so.
21  Q.  I'm going to continue to play the video.
22  (Video plays.)
23  Q.  All right, I just paused it again at 22:26:13, so
24  between those two times somebody said "We have
25  probable cause for an arrest," did you hear that?

---

STATE OF INDIANA V.
LANZELL WILLIAMS, III

ANDREW STORIE
April 8, 2022

---

**Page 21**

1  A.  Yes.
2  Q.  It appears that there's still a hand here in the
3     picture.
4  A.  Okay.
5  Q.  Whose hand is that?
6  A.  It appears to be Lanzell's, but I can't see where
7     the arm goes.
8  Q.  Okay.  If I told you that this body camera is on
9     Snodgrass right here, was there anybody else who
10    could've had that hand there?
11 A.  There was a female to Lanzell's right, a young
12    female girl.
13 Q.  Was she in the hallway or one of the rooms?
14 A.  She was in the hallway literally right beside
15    him --
16 Q.  Okay.
17 A.  -- to his right -- to my -- to -- I'm sorry, to
18    his left would be my right.
19 Q.  Using logic, though, probably more likely than
20    not his hand, not hers, correct, if he's the one being
21    demonstrative and yelling?  I guess I should ask was
22    she being demonstrative and yelling?
23 A.  That girl?
24 Q.  Yes.
25 A.  No.

---

**Page 22**

1  Q.  Okay.  Did she say anything during this whole
2     thing?
3  A.  If she did I wasn't able to hear it.
4  Q.  All right.  I'm going to keep playing from this
5     point.
6     (Video plays.)
7  Q.  And so I stopped it again at 22:26:21.  Can you
8     tell if he has the gun in his right hand at the time?
9  A.  There is something -- All I can see at this point
10    on Officer Snodgrass's body camera is that his right
11    arm is extended straight down to the right side of his
12    body.
13 Q.  Okay, and so far on this video we haven't seen
14    anywhere from Officer Snodgrass's video that shows
15    that he's pointing that firearm at anybody other than
16    holding it down by his side, correct?
17 A.  Correct.
18 Q.  Okay.
19    (Video plays.)
20 Q.  I recognize that you are struggling to get
21    control of Tiffanie at that moment.  No other commands
22    for him to put down the gun?
23 A.  At that point he had put the gun down.
24 Q.  Okay.  She's about to ask him to go get a camera.
25    Did you see him come back with the gun after he went

---

**Page 23**

1     to go get a camera?
2  A.  No, I did not.
3  Q.  All right, so let's go ahead and play this.  I
4     paused the tape at 22:26:43.  Oh, shoot.
5     MR. SNEED: I'm going to take a second.
6     MR. SEITER: Let's go off the record and take a
7     break.
8     (A recess was taken.)
9     MR. SEITER: Back on the record.
10 Q.  All right, I had paused at 22:26:43.  I'm going
11    to back this up 10 seconds and play it from here.  I
12    wanted to focus your attention on what you see from
13    Lanzell in the background in the next 10 seconds.
14    (Video plays.)
15 Q.  Okay, I paused it there at 22:26:52.  Did you see
16    the second or two before then did he appear to have a
17    gun in his hand at all?
18 A.  It was so quick I could barely tell.
19 Q.  Let me go back and review it.  I think it was
20    about 50 or 51 if you look at the counter where you
21    get a good shot of him on a cell phone.
22    (Video plays.)
23 A.  You had it at 33 and you asked me in the next 10
24    seconds and you --
25 Q.  No, I went back to 42 playing forward.

---

**Page 24**

1  A.  Okay.
2  Q.  I'll do it again, I'm at 52 right now, I'm going
3     to back up 10 seconds and play it forward.  You'll see
4     him have a phone and switch it from hand to hand.
5  A.  So you're asking from --
6  Q.  So I'm starting --
7  A.  You mentioned at 33, so that's what I'm unclear
8     on.
9  Q.  No problem.  I'm start starting at 42 --
10 A.  Okay.
11 Q.  -- and we'll watch the next 10 seconds.
12    (Video plays.)
13 Q.  Did you see the transfer of the cell phone?
14 A.  At this point he had the cell phone in his hand.
15 Q.  Right, okay, so at this point there was no
16    firearm that you could see on him?
17 A.  At this point, no, but I think if you back it up
18    10 more seconds --
19 Q.  Okay.
20 A.  -- when you showed me from 33 it shows him
21    turning around going towards the bedroom.
22 Q.  Okay, so there's 33, I'm going to back it up even
23    10 more seconds, we'll go to 23.  So that was about 39
24    or 40, right, --
25 A.  Right.

---

STATE OF INDIANA V.
LANZELL WILLIAMS, III

ANDREW STORIE
April 8, 2022

---

Page 25

1  Q. -- where he goes back to the bedroom?
2  A. He's walking back towards the bedroom.
3  Q. Okay, and at that point do you know where the gun
4     goes?
5  A. I was too busy dealing with this that I was
6     trying to keep an eye on him, her, and process what
7     just happened all in a split-second.
8  Q. Okay, but you're saying you had a gun pointed at
9     your face?
10 A. Yes.
11 Q. He's allowed to walk back to the back of the
12    house?
13 A. Due to the tightness of that hallway, due to
14    Officer Snodgrass being kind of sideways, Ms. Williams
15    in the way, had an unidentified female to his
16    right and you had him with a gun. To me charging him
17    and/or drawing my weapon at that point would've put us
18    into a different situation where I could've risked
19    getting myself shot, Officer Conner shot, Tiffanie
20    shot, Snodgrass shot, or somebody else since there was
21    in that small as we call it the fatal final hallway.
22 Q. Sure. So he goes back to a back room somewhere,
23    right? Do you know which room he goes into?
24 A. I do not. I --
25 Q. Okay.

Page 26

1  A. I don't recall.
2  Q. He comes back. You don't see the firearm
3     anymore?
4  A. I did not.
5  Q. Could've been left in the room, could be on him,
6     right?
7  A. Could've been.
8  Q. Okay. Could've been picked up by one of the
9     other teenagers in the house?
10 A. Could've been.
11 Q. You have no idea where the gun is at this point?
12 A. I don't.
13 Q. All right. Can you describe what Lanzell looks
14    like as far as height and weight?
15 A. I'd say Lanzell's approximately 6 foot tall,
16    maybe 210.
17 Q. How does he compare to Officer Snodgrass?
18 A. He's a lot smaller than Officer Snodgrass.
19 Q. And Officer Snodgrass would've been the officer
20    closest to him when he had the firearm?
21 A. Correct.
22 Q. And even when the firearm is down by its side, he
23    was still within grappling distance, is that correct?
24 A. I would say so.
25 Q. All right, so if a suspect points a gun at an

Page 27

1  officer, has the gun where it's not in ready use, like
2  it's down at the side, an officer's in grappling
3  distance, wouldn't the officer normally be trained to
4  then neutralize that threat with that gun?
5  A. Not necessarily.
6  Q. Okay, what are circumstances where they would not
7  be?
8  A. Circumstances as I described in this where you
9  had several people in tight quarters, in a hallway
10 where if Officer Snodgrass would want to make a move
11 towards Mr. Williams, the gun could've discharged and
12 could've shot me, could've shot Ms. Williams, could've
13 shot Officer Snodgrass or Officer Conner.
14 Q. Okay. What about when Lanzell doesn't have the
15 gun in his hand, he has cell phones in his hand, why
16 couldn't he have been subdued at that time?
17 A. I would say he probably could have.
18 Q. Okay. At one point you asked Officer Snodgrass
19 if he wants you to cuff him up, do you remember that?
20 A. Yes, I do.
21 Q. All right, what does that mean?
22 A. I asked Officer Snodgrass if he wanted me to
23 basically detain or to take Lanzell into custody.
24 Q. Okay. Why didn't you make that decision if
25 somebody pointed a firearm at you?

Page 28

1  A. I was still kind of still processing the
2  incident, still processing the gun pointed in my face,
3  and I was looking towards a senior officer for a
4  little bit of advice --
5  Q. Okay.
6  A. -- to kind of pull me back in.
7  Q. So I'm trying to understand if it takes you this
8  long to process whether or not you have a basis to
9  arrest somebody, why do we expect Lanzell, who has no
10 training presumably, to make a split-second decision
11 of what's going on in his house when he doesn't hear
12 "Police," he doesn't hear "probable cause," doesn't
13 here anything until he's hearing officers saying "Put
14 the gun down" and then he appears to?
15 A. Clarify your question.
16 Q. It was a convoluted question. Let me go back.
17 It took you awhile to process what was going on, it
18 was a traumatic situation, is that fair?
19 A. Before or after the incident?
20 Q. Let's say when you're arresting Tiffanie --
21 A. Okay.
22 Q. -- and Lanzell comes out of the bedroom, Lanzell
23 is not arrested for like an hour later, is that
24 correct?
25 A. I don't know the exact time.

STATE OF INDIANA V.                                                                ANDREW STORIE
LANZELL WILLIAMS, III                                                               April 8, 2022

| Page 29 |
| --- |

1  Q.  Okay, fair to say it wasn't within the first 30
2  minutes?
3  A.  I don't know that exact time.
4  Q.  Lanzell was free to walk around the apartment
5  while you were trying to detain Tiffanie?
6  A.  I agree with that.
7  Q.  Even walked behind officers?
8  A.  I would agree with that.
9  Q.  He walked in and out of the residence?
10 A.  Yes.
11 Q.  At one point I think you even ordered him to go
12 out, didn't you, or back up?
13 A.  Back up.
14 Q.  Okay, and when he backed up, he backed up out of
15 the house?
16 A.  Finally, yes.
17 Q.  Okay, and even when EMTs arrived he's still
18 walking around freely?
19 A.  Yes.
20 Q.  And nobody knows where the gun is?
21 A.  I did not know where it was at, I don't know
22 about anybody else's knowledge.
23 Q.  Did anybody from your department ever seize the
24 gun?
25 A.  I don't have an answer to that because I didn't

| Page 31 |
| --- |

1  we see he has no gun, that happens in less than a
2  minute, correct?
3  A.  I don't know the exact time.
4  Q.  Do you want to measure it?  I mean we can go back
5  on video if you want to look at it.
6  A.  I mean we can.  I mean I don't know the exact
7  timeline.
8  Q.  I'm not asking for exact time, but it's less than
9  a minute, isn't it?
10 A.  It could've been two minutes, I don't know.
11 Q.  All right, but whatever it is on videotape you're
12 fine with, correct?
13 A.  Sure.
14 Q.  Okay.  At one point on the video I hear him say
15 "I will kick you in the face, bitch," who was he
16 talking to at that time?
17 A.  He was directing that towards Officer Snodgrass
18 and Officer Conner, but I felt in my personal opinion
19 that was directed toward Officer Conner.
20 Q.  Okay.  Did you hear any other threats that Mr.
21 Williams made to you or any other officer?
22 A.  After that one, other than "You will be sued,"
23 that would be the only other type of threat I believe
24 I --
25 Q.  And you consider that to be a threat?

| Page 30 |
| --- |

1  do it.
2  Q.  Okay, did you ever see it taken into evidence?
3  A.  I did not.  I'm not an evidence technician.
4  Q.  Okay, but you didn't see it taken into evidence
5  by anybody else?
6  A.  I don't do any of that.
7  Q.  Okay.  At one point you asked if you should cuff
8  him up.  What is Officer Snodgrass's response?
9  A.  His first response I couldn't understand, Dave
10 kind of mumbles when he talks a little bit, so I asked
11 him to clarify himself and he said, I had to really
12 listen to this part on the camera, "Let's wait to see
13 what the county" -- either "the county says" or "Let's
14 wait" -- To be honest with you, I can't remember
15 exactly without seeing it, but I know I asked him to
16 clarify when I first asked him because I couldn't
17 understand him.
18 Q.  All right.  So getting back to my original
19 question that was convoluted, officers take awhile to
20 process this, they take minutes at least?
21 A.  Okay.
22 Q.  Lanzell has seconds that we saw on videotape from
23 the time he comes out in the hallway to the time
24 officers are telling him to put the gun down to the
25 point where we see the gun down by his side and then

| Page 32 |
| --- |

1  A.  It's not a nice gesture, so I don't really
2  consider it a -- I would consider it a --
3  Q.  It's job security for me, right?
4  A.  Yeah.
5  Q.  No, but you felt threatened by him saying he was
6  going to sue you?
7  A.  No, I did not feel threatened, --
8  Q.  Okay.
9  A.  -- no.
10 Q.  But you considered it to be a threat?
11 A.  Yes.  I did not feel my life was threatened by
12 that.
13 Q.  The decision to arrest him was not made until
14 after he had been telling you that he was going to sue
15 you?
16 A.  After he mentioned it, yes, correct.
17 Q.  Okay.  You're familiar with the offense of
18 intimidation?
19 A.  Yes.
20 Q.  Can you tell me what the elements are?
21 A.  Without seeing it I don't --
22 Q.  Okay, fair enough.
23 A.  -- I don't know word for word.
24 Q.  Most lawyers can't either, so don't worry about
25 it, but you understand that there would have to be

STATE OF INDIANA V.
LANZELL WILLIAMS, III

ANDREW STORIE
April 8, 2022

---

Page 33

1  some threat made in response to a lawful action, is
2  that correct?
3  A.  I agree with that.
4  Q.  All right, and is a specific intent crime meaning
5  that somebody has to do that knowingly or
6  intentionally?
7  A.  Agreed.
8  Q.  All right.  What can you point to with your
9  original encounter of Lanzell in that time period
10  where he had a firearm pointed would you say that he
11  knowingly or intentionally was doing it in response to
12  lawful conduct as opposed to what he believed to be
13  unlawful conduct?
14  A.  Can you rephrase that?
15  Q.  I sure can.  When he first came out into the
16  hallway and had a firearm you said pointed at you and
17  then -- I'm sorry, at Officer Snodgrass and then at
18  you.
19  A.  Correct.
20  Q.  What makes you believe that he was doing that in
21  response to lawful conduct as opposed to what he
22  perceived to be unlawful conduct?
23  A.  I still need you to rephrase that.
24  Q.  Okay.
25  A.  I'm not understanding your question.

---

Page 34

1  Q.  Did you get the sense that he thought what you
2  were doing was illegal even if you thought it was
3  legal?
4  A.  Yes.
5  Q.  Okay, and you got that from his communication,
6  what he was saying to you at the time, correct?
7  A.  Yes.
8  Q.  All right, and so once it's said that there's
9  probable cause for Tiffanie's arrest you see him put
10  the gun down by his side?
11  A.  Not -- I don't think I can answer that in my
12  opinion with a "yes" or "no" answer.
13  Q.  Okay.  If we reviewed the video, does that seem
14  to be consistent with what happened?
15  A.  I still don't think that question can be answered
16  with a "yes" or "no" --
17  Q.  Okay.
18  A.  -- answer.
19  Q.  Were you present when Lanzell was later arrested
20  or were you with Tiffanie at the time?
21  A.  I was present.
22  Q.  Okay, and Lanzell was allowed to go back into his
23  house --
24  A.  Yeah.
25  Q.  -- prior to being arrested?

---

Page 35

1  A.  I'll say he went back in, whether he was allowed
2  or not, but yes, he --
3  Q.  Nobody told him he couldn't go back into his
4  house?
5  A.  Yes.
6  Q.  He closed the door?
7  A.  Yes.
8  Q.  When officers knocked he originally refused to
9  answer the door?
10  A.  Yes.
11  Q.  Did you or anybody else in your department that
12  you're aware of obtain a warrant for his arrest?
13  A.  I did not.
14  Q.  Do you know if anybody else did?
15  A.  I do not know.
16  Q.  Okay.  Mr. Williams eventually opened the door?
17  A.  Yes.
18  Q.  And was he pulled out of his house?
19  A.  He walked out.
20  Q.  Did he walk out or was he pulled out?
21  A.  Without reviewing the body camera I can't
22  accurately answer that.
23  Q.  Fair enough.  So if the body camera shows him
24  being pulled out, you would have no reason to dispute
25  that?

---

Page 36

1  A.  If the body camera showed that he was pulled out
2  I would not have any reason to dispute that.
3  Q.  Okay, and Lanzell did not resist when he was
4  being grabbed, is that correct, or I'm sorry, when he
5  was arrested?
6  A.  He did not.
7  Q.  All right.
8  MR. SEITER:  We can go off the record for a
9  second.
10  (Off the record.)
11  MR. SEITER:  Go back on the record.
12  Q.  Were you involved in writing up the Probable
13  Cause Affidavit for the charges to be filed?
14  A.  I was not.
15  Q.  Did you alter any document by multiplying a
16  charge times three on a Probable Cause Affidavit?
17  A.  I remember there was something on the PC when we
18  got into the jail something was not right.  I believe
19  I made a phone call to either Officer Snodgrass or
20  Chief Turner about -- Without reviewing my body camera
21  I cannot definitively say that, but I do know what
22  you're talking about.
23  Q.  Okay, was it a handwritten change that you made?
24  A.  Without seeing my body camera I can't
25  definitively answer that.

---

STATE OF INDIANA V.                                        ANDREW STORIE
LANZELL WILLIAMS, III                                        April 8, 2022

Page 37

1  Q.  Okay.  Do you remember making an altercation
2    (sic) of some sort, though?
3  A.  I remember there was a discrepancy with the
4    PC, --
5  Q.  Okay.
6  A.  -- I don't remember what it was, though.
7  Q.  Would that cause someone to get a higher bail or
8    a lower bail based on what was changed?
9  A.  I don't know, I don't work at the jail, I don't
10    set bails.
11  Q.  Okay, you're familiar with the bail process,
12    though, aren't you?
13  A.  Actually, when anybody asks me what their bail is
14    I tell them to ask the jail because I don't want to
15    tell them the wrong thing and I don't work at the
16    jail, --
17  Q.  All right.
18  A.  -- that's actually what I tell everybody.
19        MR. SEITER: I don't think I have any further
20    questions.
21        MR. SNEED: I don't have any questions for you.
22        MR. SEITER: Signature?
23        MR. SNEED: We'll go ahead and review it just so
24    he can have a chance to look it over.
25        MR. SEITER: Fair enough.

Page 38

1        MR. SNEED: Thank you.
2        (WHEREUPON, at 2:50 p.m. this deposition
3    concluded.)
4
5
6
7
8        FURTHER DEPONENT SAITH NOT
9
10
11
12    _____
13        ANDREW STORIE
14    (Subject to any notations made
15    on Errata Sheet.)
16
17
18
19
20
21
22
23
24
25

Page 39

1              CERTIFICATE
2
3
4    STATE OF INDIANA
                                ss:
4    COUNTY OF HAMILTON
5
6
7        I, Marjorie A. Addington, the undersigned Court
    Reporter and Notary Public residing and maintaining
    offices in the City of Carmel, Hamilton County, Indiana,
8    do hereby certify:
9        That at the time and place described above in
    this transcript, the witness, ANDREW STORIE, was
10    presented before me for administration of an oath of
    truthfulness which oath I then administered;
11        That I then reported to the best of my ability
12    in machine shorthand all of the words spoken by all
    parties in attendance during the course of the ensuing
13    proceedings, including objections, if any, made by all
    counsel present;
14        That I later reduced my shorthand notes into the
15    foregoing typewritten transcript form, which typewritten
    transcript is a true record to the best of my ability of
16    the testimony given by this witness as stated above;
17        That I am not a relative or employee or attorney
    or counsel of any of the parties, nor am I a relative or
18    an employee of such attorney or counsel, and that I am
    not financially interested in this action.
19
20        IN WITNESS HERETO, I have affixed
        my Notarial Seal and subscribed
21        my signature below this 15th day of
        APRIL, 2022.
22
23    _____
    Notary Public
24    County of Residence:  Hamilton      (Seal)
    My Commission Expires on:  JUNE 25, 2023
25    NOTARY #NP0669599

STATE OF INDIANA V.
LANZELL WILLIAMS, III

ANDREW STORIE
April 8, 2022

## A

**able (4)**
18:3,5,14;22:3
**above (1)**
8:11
**academy (3)**
5:18,21;17:13
**according (1)**
13:20
**accurate (2)**
6:23;17:4
**accurately (1)**
35:22
**action (1)**
33:1
**actually (3)**
8:9;37:13,18
**additional (1)**
11:12
**addressed (1)**
3:8
**advice (1)**
28:4
**advised (2)**
10:19;13:21
**advising (1)**
16:20
**Affidavit (2)**
36:13,16
**Again (4)**
10:12;20:23;22:7;
24:2
**against (3)**
10:15;11:2;14:12
**ago (2)**
10:1,12
**agree (4)**
14:22;29:6,8;33:3
**Agreed (1)**
33:7
**ahead (3)**
18:14;23:3;37:23
**ahold (1)**
16:19
**allowed (3)**
25:11;34:22;35:1
**almost (1)**
9:25
**alter (1)**
36:15
**altercation (1)**
37:1
**always (1)**
4:11
**and/or (1)**
25:17
**Andrew (4)**
3:6,7,9;38:13
**announce (4)**
16:1,4;19:3,17
**announced (2)**

19:13,16
**answered (2)**
4:15;34:15
**anymore (1)**
26:3
**apartment (5)**
14:1,12,24;15:7;29:4
**appear (1)**
23:16
**appears (4)**
9:21;21:2,6;28:14
**approximately (1)**
26:15
**area (1)**
19:22
**arm (2)**
21:7;22:11
**around (6)**
14:21;19:22,23;
24:21;29:4,18
**arrest (10)**
12:3,10;13:21;19:4,
14;20:25;28:9;32:13;
34:9;35:12
**arrested (4)**
28:23;34:19,25;36:5
**arresting (1)**
28:20
**arrived (1)**
29:17
**assigned (1)**
11:8
**assist (1)**
9:11
**assisting (1)**
11:9
**assume (1)**
4:14
**attention (2)**
7:6;23:12
**attorney (1)**
3:17
**available (1)**
10:7
**aware (1)**
35:12
**awhile (2)**
28:17;30:19

## B

**back (31)**
14:18,21;15:2;18:23;
20:10,11;22:25;23:9,
11,19,25;24:3,17,22;
25:1,2,11,11,22,22;
26:2;28:6,16;29:12,13;
30:18;31:4;34:22;35:1,
3;36:11
**backed (2)**
29:14,14
**background (1)**
23:13

**bail (4)**
37:7,8,11,13
**bails (1)**
37:10
**Ball (1)**
8:8
**barely (1)**
23:18
**based (2)**
12:15;37:8
**basically (2)**
11:11;27:23
**basis (2)**
13:19;28:8
**bathroom (1)**
4:6
**bedroom (4)**
24:21;25:1,2;28:22
**behind (3)**
16:22;17:9;29:7
**belief (1)**
12:14
**beside (1)**
21:14
**best (1)**
4:11
**bit (3)**
11:4;28:4;30:10
**bitch (1)**
31:15
**body (12)**
4:23,24;18:11,12;
21:8;22:10,12;35:21,
23;36:1,20,24
**body-worn (1)**
7:3
**both (1)**
16:24
**break (3)**
4:5,8;23:7
**Brittney (2)**
7:18;9:8
**building (2)**
14:22,24
**busy (1)**
25:5

## C

**CAD (2)**
9:21;10:6
**call (4)**
11:8;16:10;25:21;
36:19
**called (1)**
9:11
**cam (2)**
18:11,12
**came (5)**
8:5;9:9;16:23;20:9;
33:15
**camera (14)**
4:23,24;7:3;19:10;

21:8;22:10,24;23:1;
30:12;35:21,23;36:1,
20,24
**can (17)**
5:6;10:5;18:23;
20:10;22:7,9;26:13;
31:4,6;32:20;33:8,14,
15;34:11,15;36:8;
37:24
**captured (1)**
18:7
**case (1)**
15:22
**cause (13)**
11:22;12:2,14;13:20,
21;19:4,14;20:25;
28:12;34:9;36:13,16;
37:7
**cell (4)**
23:21;24:13,14;
27:15
**chance (2)**
4:2;37:24
**change (1)**
36:23
**changed (1)**
37:8
**charge (3)**
13:22;15:19;36:16
**charges (1)**
36:13
**charging (1)**
25:16
**check (4)**
11:1,15,17;12:19
**chief (4)**
8:8,9,12;36:20
**circumstances (2)**
27:6,8
**clarify (5)**
3:24;10:5;28:15;
30:11,16
**clear (1)**
3:22
**closed (1)**
35:6
**closest (1)**
26:20
**coming (3)**
13:12;19:9,12
**command (1)**
20:5
**commands (1)**
22:21
**communication (1)**
34:5
**compare (1)**
26:17
**complaint (2)**
7:8;11:19
**complaints (1)**
7:12
**complete (1)**

5:18
**computer (1)**
10:10
**concluded (1)**
38:3
**conduct (4)**
33:12,13,21,22
**confirm (1)**
10:22
**confronting (1)**
10:23;19:13
**Conner (5)**
9:13;25:19;27:13;
31:18,19
**Conner's (1)**
18:12
**consider (3)**
31:25;32:2,2
**considered (1)**
32:10
**consistent (1)**
34:14
**constitution (1)**
6:11
**constitutional (1)**
6:2
**contact (1)**
12:20
**continue (2)**
19:7;20:21
**control (1)**
22:21
**conversations (1)**
8:25
**convoluted (2)**
28:16;30:19
**core (1)**
13:3
**correctly (1)**
10:17
**counter (1)**
23:20
**country (1)**
19:23
**County (3)**
9:11;30:13,13
**couple (1)**
3:21
**court (1)**
4:1
**cover (2)**
15:1,2
**covered (1)**
15:3
**crime (2)**
11:23;33:4
**criminal (2)**
9:1;19:20
**cuff (2)**
27:19;30:7
**currently (1)**
5:12
**custody (1)**

STATE OF INDIANA V.
LANZELL WILLIAMS, III

ANDREW STORIE
April 8, 2022

27:23

**D**

database (1)
12:19
date (2)
7:7,10
Dave (2)
3:16;30:9
day (1)
6:21
deal (1)
9:10
dealing (1)
25:5
decision (3)
27:24;28:10;32:13
Defendant's (1)
9:19
deficit (1)
8:12
definitively (3)
10:13;36:21,25
demonstrative (2)
21:21,22
Department (8)
5:13;6:9,12,15;8:2;
12:20;29:23;35:11
DEPONENT (1)
38:8
deposed (2)
3:10,12
deposition (4)
3:13;4:19;9:9;38:2
deputy (2)
8:8,9
describe (2)
16:17;26:13
described (1)
27:8
despite (1)
4:10
destroyed (1)
15:19
detain (3)
17:18;27:23;29:5
different (1)
25:18
DIRECT (1)
3:3
directed (1)
31:19
directing (1)
31:17
direction (1)
17:8
dirty (1)
4:1
discharged (1)
27:11
discrepancy (1)
37:3

discussion (1)
15:12
dispatched (3)
9:10,15;10:18
dispute (1)
35:24;36:2
distance (2)
26:23;27:3
document (2)
9:20;36:15
documents (1)
5:2
done (1)
11:23
door (16)
12:23;13:1,3,9,11,
17;14:2,4,5,8,15;15:6;
18:19;35:6,9,16
doors (3)
14:18,23;15:2
down (13)
15:23;17:22,24;
22:11,16,22,23;26:22;
27:2;28:14;30:24,25;
34:10
draw (1)
17:21
drawing (1)
25:17
dressing (1)
19:21
drop (1)
20:5
drug (1)
15:22
due (2)
25:13,13
during (1)
22:1
duty (3)
9:13,14,14

**E**

Eaton (1)
5:13
either (5)
4:13;14:2;30:13;
32:24;36:19
elements (1)
32:20
else (8)
16:1;17:9;19:17;
21:9;25:20;30:5;35:11,
14
else's (3)
4:24;18:9;29:22
employed (3)
5:10,12,16
EMTs (1)
29:17
encounter (1)
33:9

encountering (1)
11:3
end (2)
14:22,23
Enforcement (1)
5:21
enough (8)
10:14;12:10;13:4;
18:5;19:19;32:22;
35:23;37:25
entered (2)
14:6;16:2
entire (3)
4:2,4;14:24
Errata (1)
38:15
essentially (1)
11:9
eternity (2)
17:5,6
even (6)
24:22;26:22;29:7,11,
17;34:2
eventually (1)
35:16
everybody (1)
37:18
evidence (4)
15:18;30:2,3,4
exact (5)
28:25;29:3;31:3,6,8
exactly (2)
16:20;30:15
EXAMINATION (1)
3:3
Exhibit (1)
9:19
expect (1)
28:9
explain (2)
11:4;12:8
explained (1)
12:8
extended (1)
22:11
eye (1)
25:6

**F**

face (3)
25:9;28:2;31:15
fair (9)
4:16;10:14;12:17;
13:4;28:18;29:1;32:22;
35:23;37:25
false (1)
6:25
familiar (2)
32:17;37:11
far (3)
8:25;22:13;26:14
fatal (1)

25:21
feel (3)
12:2;32:7,11
felt (4)
17:4,6;31:18;32:5
female (3)
21:11,12;25:15
few (1)
8:1
figured (1)
3:15
filed (1)
36:13
final (1)
25:21
finally (2)
4:10;29:16
find (1)
12:21
fine (2)
3:9;31:12
finger (1)
17:9;20:8,14
firearm (11)
16:23,25;17:8;22:15;
24:16;26:2,20,22;
27:25;33:10,16
First (6)
3:22;17:12;29:1;
30:9,16;33:15
flushing (1)
15:22
focus (1)
23:12
foot (1)
26:15
footage (3)
4:23,25;7:4
force (1)
5:25
form (1)
8:17
formed (1)
7:24
forward (2)
23:25;24:3
four (1)
5:15
free (2)
4:5;29:4
freely (1)
29:18
front (2)
5:2;15:1
full (1)
19:18
Full-time (1)
5:15
further (1)
37:19;38:8

**G**

gesture (1)
32:1
girl (2)
21:12,23
goes (5)
21:7;25:1,4,22,23
good (1)
23:21
grab (1)
16:19
grabbed (1)
36:4
graduated (1)
5:22
grappling (2)
26:23;27:2
Gregory (2)
5:23,25
guess (1)
21:21
gun (29)
9:4;17:16,19,22,24;
18:5;20:6;22:8,22,23,
25;23:17;25:3,8,16;
26:11,25;27:1,4,11,15;
28:2,14;29:20,24;
30:24,25;31:1;34:10
guns (2)
8:5,14

**H**

halfway (1)
12:6
hallway (10)
16:14,18,23;21:13,
14;25:13,21;27:9;
30:23;33:16
hand (12)
17:19;21:2,5,10,20;
22:8;23:17;24:4,4,14;
27:15,15
handling (1)
12:1
handwritten (1)
36:23
happened (4)
6:21;19:23;25:7;
34:14
happens (1)
31:1
hard- (1)
13:2
head (2)
3:23;16:24
hear (7)
16:4;20:25;22:3;
28:11,12;31:14,20
heard (3)
4:14;12:5;19:2
hearing (1)
28:13
height (1)

STATE OF INDIANA V.
LANZELL WILLIAMS, III

ANDREW STORIE
April 8, 2022

26:14
herself (1)
  8:7
higher (1)
  37:7
himself (1)
  30:11
history (1)
  9:1
hold (1)
  18:4
holding (1)
  22:16
home (2)
  13:15;19:21
honest (3)
  6:1;17:5;30:14
honestly (1)
  4:16
Hospital (1)
  8:8
hour (1)
  28:23
house (14)
  13:19;14:18;15:10,
  16,16;16:2,8;25:12;
  26:9;28:11;29:15;
  34:23;35:4,18
husband (2)
  8:4;16:10

**I**

idea (1)
  26:11
illegal (1)
  34:2
important (2)
  3:22,24
incident (4)
  9:25;10:18;28:2,19
independent (1)
  12:16
Indiana (1)
  5:21
information (7)
  6:23;8:4,11;9:23;
  10:3,20;12:10
Insight (1)
  12:19
instructors (1)
  5:23
intent (1)
  33:4
intentionally (2)
  33:6,11
intentions (1)
  17:10
interaction (3)
  8:19,23,25
interactions (4)
  7:17,19;8:1,2
interrupt (1)

3:25
intimidation (1)
  32:18
into (14)
  13:14;15:10;16:12,
  14,14;25:18,23;27:23;
  30:2,4;33:15;34:22;
  35:3;36:18
introduce (1)
  3:16
invasion (3)
  11:19;13:24;15:19
invasions (1)
  19:21
investigation (2)
  11:20,24
involved (3)
  8:3,16;36:12
involving (1)
  8:2
issue (1)
  9:10
issued (1)
  10:15
issues (1)
  8:13

**J**

jail (5)
  8:10;36:18;37:9,14,
  16
January (1)
  5:22
Jay (1)
  9:11
Jayda (5)
  7:8,10;9:8;10:16;
  11:18
jibe (1)
  7:3
job (1)
  32:3
July (4)
  5:16;7:7,21;8:22

**K**

k9 (1)
  9:11
keep (2)
  22:4;25:6
kick (1)
  31:15
kill (1)
  8:7
kind (5)
  11:10;25:14;28:1,6;
  30:10
knew (1)
  15:15
knocked (2)
  15:6;35:8

knowing (1)
  17:10
knowingly (2)
  33:5,11
knowledge (2)
  7:13;29:22
knows (1)
  29:20

**L**

language (1)
  19:15
Lanzell (25)
  3:17,19;8:4,21,23;
  13:15;16:10,12,22,22;
  17:18;19:12;23:13;
  26:13;27:14,23;28:9,
  22,22;29:4;30:22;33:9;
  34:19,22;36:3
Lanzell's (4)
  19:11;21:6,11;26:15
last (1)
  4:8
later (2)
  28:23;34:19
Law (1)
  5:21
lawful (3)
  33:1,12,21
lawyers (1)
  32:24
leading (1)
  16:14
learn (2)
  6:11,14
least (1)
  30:20
left (4)
  14:11;15:16;21:18;
  26:5
legal (1)
  34:3
less (2)
  31:1,8
life (1)
  32:11
likely (1)
  21:19
listen (1)
  30:12
literally (1)
  21:14
little (3)
  11:4;28:4;30:10
living (1)
  4:10
logic (1)
  21:19
long (3)
  5:14;18:5;28:8
look (5)
  14:21;18:14;23:20;

31:5;37:24
looked (2)
  18:6;20:8
looking (1)
  28:3
looks (2)
  4:1;26:13
lot (1)
  26:18
lower (1)
  37:8

**M**

makes (1)
  33:20
making (1)
  37:1
many (3)
  14:1;15:5;17:2
marked (1)
  9:18
may (1)
  3:24
maybe (1)
  26:16
mean (4)
  27:21;31:4,6,6
meaning (1)
  33:4
measure (1)
  31:4
mental (4)
  7:24;8:8,12,18
mentioned (2)
  24:7;32:16
minute (2)
  31:2,9
minutes (4)
  9:17;29:2;30:20;
  31:10
moment (4)
  12:3;16:17;18:13;
  22:21
more (4)
  11:4;21:19;24:18,23
Most (1)
  32:24
move (1)
  27:10
multiplying (1)
  36:15
mumbles (1)
  30:10
myself (3)
  3:16;18:4;25:19

**N**

name (2)
  3:4,16
nearest (1)
  17:14

necessarily (2)
  11:25;27:5
need (5)
  4:4;5:6;6:18;18:22;
  33:23
neutralize (1)
  27:4
next (3)
  23:13,23;24:11
nice (1)
  32:1
nobody (3)
  19:13;29:20;35:3
none (1)
  19:14
normally (1)
  27:3
notations (1)
  38:14
notes (1)
  9:21
notice (1)
  5:2
number (1)
  17:4

**O**

obtain (1)
  35:12
obtained (2)
  15:10,13
obviously (1)
  14:8
occurred (1)
  11:23
o'clock (1)
  9:15
off (3)
  23:6;36:8,10
offense (1)
  32:17
Officer (45)
  3:7;9:7,12,13,14,15,
  19;11:8,10,25;12:9,15,
  24;13:17;15:1,2;16:19,
  24;18:3,11,12,14;
  22:10,14;25:14,19;
  26:17,18,19,19;27:1,3,
  10,13,13,18,22;28:3;
  30:8;31:17,18,19,21;
  33:17;36:19
officers (11)
  8:11;9:14;15:5;16:4;
  17:18,21;28:13;29:7;
  30:19,24;35:8
officer's (1)
  27:2
once (2)
  13:11;34:8
one (13)
  5:23;6:18;8:19,23;
  14:4;21:13,20;26:8;

27:18;29:11;30:7;
31:14,22
**only (5)**
3:18;9:12;14:4;
18:12;31:23
**open (2)**
13:11,11
**opened (2)**
13:17;35:16
**opens (1)**
18:18
**opinion (4)**
7:24;8:17;31:18;
34:12
**opposed (2)**
33:12,21
**order (5)**
10:15,19,23;11:2;
13:23
**ordered (1)**
29:11
**ordering (1)**
16:8
**original (2)**
30:18;33:9
**originally (2)**
9:10;35:8
**out (19)**
4:2,4;12:21;16:8,23;
17:19;19:12;28:22;
29:9,12,14;30:23;
33:15;35:18,19,20,20,
24;36:1
**outside (1)**
8:24
**over (3)**
3:21;5:15;37:24
**own (2)**
17:21;18:12

**P**

**part (1)**
30:12
**pause (2)**
18:22,23
**paused (5)**
20:16,23;23:4,10,15
**pausing (1)**
20:2
**PC (2)**
36:17;37:4
**peephole (1)**
13:7
**people (2)**
19:21;27:9
**perceived (1)**
33:22
**percent (2)**
14:3,4
**period (1)**
33:9
**permit (1)**

9:5
**personal (1)**
31:18
**personally (4)**
8:3;11:21,22;12:13
**phone (5)**
23:21;24:4,13,14;
36:19
**phones (1)**
27:15
**picked (1)**
26:8
**picture (1)**
21:3
**place (3)**
10:20,23;11:10
**play (4)**
20:21;23:3,11;24:3
**playing (3)**
19:7;22:4;23:25
**plays (11)**
18:21,25;19:8;20:1,
13,22;22:6,19;23:14,
22;24:12
**please (3)**
3:4;4:12;11:7
**pm (2)**
3:1;38:2
**point (19)**
9:12;18:3;19:2,6;
22:5,9,23;24:14,15,17;
25:3,17;26:11;27:18;
29:11;30:7,25;31:14;
33:8
**pointed (10)**
16:23;17:1,2,8;18:4;
25:8;27:25;28:2;33:10,
16
**pointing (1)**
22:15
**points (1)**
26:25
**Police (9)**
5:13;8:2;16:1,5;19:3,
13,19,21;28:12
**posed (1)**
4:8
**prepared (1)**
6:20
**present (3)**
15:5;34:19,21
**presumably (1)**
28:10
**pretty (1)**
17:24
**principles (1)**
6:3
**prior (8)**
4:18;7:21;9:17;
10:23;11:2;15:10;
19:12;34:25
**privacy (3)**
11:20;13:24;15:19

**privy (1)**
8:4
**probable (12)**
11:22;12:2,14;13:20,
21;19:4,14;20:25;
28:12;34:9;36:12,16
**probably (5)**
4:3;10:6;15:11;
21:19;27:17
**problem (1)**
24:9
**procedures (2)**
6:6,14
**proceeded (1)**
9:16
**process (5)**
25:6;28:8,17;30:20;
37:11
**processing (2)**
28:1,2
**profession (1)**
3:16
**prosecutor (1)**
4:6
**protective (5)**
10:14,19,23;11:1;
13:23
**providing (1)**
11:11
**pull (1)**
28:6
**pulled (4)**
35:18,20,24;36:1
**pursuit (1)**
9:12
**put (10)**
6:25;9:13;17:22,24;
22:22,23;25:17;28:13;
30:24;34:9

**Q**

**quarters (1)**
27:9
**quick (1)**
23:18
**quickly (2)**
17:24;18:1

**R**

**read (2)**
12:4;19:20
**ready (1)**
27:1
**realize (1)**
19:19
**really (2)**
30:11;32:1
**reason (3)**
15:9;35:24;36:2
**recall (9)**
6:4;8:24;10:1;13:8;

14:16,19;16:6,7;26:1
**receive (2)**
6:8;10:2
**received (1)**
9:24
**recess (1)**
23:8
**recognize (2)**
9:20;22:20
**record (7)**
3:5;5:7;23:6,9;36:8,
10,11
**refer (1)**
5:6
**refused (1)**
35:8
**regarding (1)**
9:24
**reliable (1)**
7:14
**remember (9)**
10:17;14:17;16:20;
27:19;30:14;36:17;
37:1,3,6
**removed (1)**
8:5
**repeat (1)**
4:13
**rephrase (3)**
4:13;33:14,23
**report (5)**
5:3,6;6:20;7:1;10:4
**reporter (1)**
4:1
**reports (1)**
19:20
**represent (2)**
3:18,19
**representing (1)**
3:17
**residence (3)**
8:6;9:16;29:9
**resist (1)**
36:3
**resources (1)**
11:12
**respond (1)**
7:7
**response (5)**
30:8,9;33:1,11,21
**reverse (1)**
20:12
**review (4)**
4:24;12:12;23:19;
37:23
**reviewed (8)**
4:18,21,22,22;18:10,
11,12;34:13
**reviewing (2)**
35:21;36:20
**right (61)**
3:10;5:14,20;6:5,11,
18,20;7:6,18;8:17,21;

9:4;11:14,18;13:1,14;
14:5,11,20;15:5,16,19;
16:17;18:18;19:1;20:2,
5,8,17,17,23;21:9,11,
14,17,18;22:4,8,10,11;
23:3,10;24:2,15,24,25;
25:16,23;26:6,13,25;
27:21;30:18;31:11;
32:3;33:4,8;34:8;36:7,
18;37:17
**risked (1)**
25:18
**room (6)**
16:12,15;19:12;
25:22,23;26:5
**rooms (1)**
21:13
**rules (1)**
3:21
**run (2)**
9:24;10:7
**running (1)**
16:18

**S**

**SAITH (1)**
38:8
**Same (1)**
7:19
**saw (1)**
30:22
**saying (5)**
16:21;25:8;28:13;
32:5;34:6
**scared (1)**
17:6
**screaming (2)**
16:7,22
**screen (2)**
13:9;20:3
**second (3)**
23:5,16;36:9
**seconds (3)**
17:2;23:11,13,24;
24:3,11,18,23;30:22
**security (2)**
11:12;32:3
**seeing (3)**
30:15;32:21;36:24
**seem (1)**
34:13
**SEITER (9)**
3:3,17;23:6,9;36:8,
11;37:19,22,25
**seize (1)**
29:23
**seized (1)**
8:14
**senior (1)**
28:3
**sense (1)**
34:1

STATE OF INDIANA V.
LANZELL WILLIAMS, III

ANDREW STORIE
April 8, 2022

served (3)
  11:2,16;12:21
set (1)
  37:10
several (2)
  9:16;27:9
shake (1)
  3:23
shared (1)
  14:13
Sheet (1)
  38:15
sheriff's (1)
  12:20
shoot (1)
  23:4
shot (8)
  23:21;25:19,19,20,
  20;27:12,12,13
show (2)
  9:18;18:13
showed (2)
  24:20;36:1
shows (3)
  22:14;24:20;35:23
sic (1)
  37:2
side (10)
  14:8,23,24;17:24;
  22:11,16;26:22;27:2;
  30:25;34:10
sides (1)
  14:1
sideways (1)
  25:14
Signature (1)
  37:22
situation (2)
  25:18;28:18
slightly (1)
  20:17
small (1)
  25:21
smaller (1)
  26:18
SNEED (4)
  23:5;37:21,23;38:1
Snodgrass (23)
  9:7,14,15;12:9,15,
  24;13:18;16:19;17:3;
  18:3;21:9;25:14,20;
  26:17,18,19;27:10,13,
  18,22;31:17;33:17;
  36:19
Snodgrass's (7)
  9:19;16:24;18:11,14;
  22:10,14;30:8
solely (1)
  8:19
solid (2)
  13:1,2
somebody (6)
  17:9;20:24;25:20;

27:25;28:9;33:5
somebody's (1)
  15:22
someone (2)
  18:9;37:7
somewhere (1)
  25:22
sorry (3)
  21:17;33:17;36:4
sort (1)
  37:2
Sparks (2)
  7:18;9:8
specific (1)
  33:4
split-second (2)
  25:7;28:10
stare (1)
  18:5
start (2)
  14:5;24:9
starting (3)
  18:17;24:6,9
state (1)
  3:4
stated (1)
  12:9
statement (1)
  12:17
statements (2)
  6:25;12:4
status (2)
  7:25;8:18
still (8)
  21:2;26:23;28:1,1,2;
  29:17;33:23;34:15
stop (2)
  16:21;19:1
stopped (2)
  19:10;22:7
Storie (4)
  3:6,7,8;38:13
straight (1)
  22:11
struggling (1)
  22:20
subdued (1)
  27:16
Subject (1)
  38:14
sue (2)
  32:6,14
sued (1)
  31:22
suicidal (1)
  8:6
supplement (2)
  4:22;12:9
supplemental (1)
  6:8
Sure (12)
  6:19;10:6;11:5;14:3,
  4;15:11;17:11;19:24;

20:11;25:22;31:13;
  33:15
suspect (1)
  26:25
switch (1)
  24:4
sworn (1)
  3:1
system (1)
  9:22

**T**

talk (1)
  4:6
talked (1)
  9:8
talking (2)
  31:16;36:22
talks (1)
  30:10
tall (1)
  26:15
tape (1)
  23:4
teach (2)
  6:2,5
technician (1)
  30:3
teenagers (1)
  26:9
telling (2)
  30:24;32:14
tendencies (1)
  8:6
though (4)
  21:19;37:2,6,12
thought (3)
  8:7;34:1,2
threat (7)
  17:14,16;27:4;31:23,
  25;32:10;33:1
threatened (3)
  32:5,7,11
threats (1)
  31:20
Three (2)
  15:8;36:16
Tier (1)
  5:21
Tiffanie (16)
  3:18;7:22;8:23;
  10:15,24;11:2,3;12:3;
  13:15;15:6;16:7;22:21;
  25:19;28:20;29:5;
  34:20
Tiffanie's (4)
  12:23;14:1;15:15;
  34:9
tight (1)
  27:9
tightness (1)
  25:13

timeline (1)
  31:7
times (2)
  20:24;36:16
today (1)
  4:19
toilet (1)
  15:23
told (3)
  8:11;21:8;35:3
Tony (2)
  5:23,25
took (3)
  7:4;8:9;28:17
total (1)
  14:3
toward (1)
  31:19
towards (7)
  16:18;18:4;24:21;
  25:2;27:11;28:3;31:17
trained (2)
  17:14;27:3
training (5)
  6:8,12,15;17:13;
  28:10
transfer (1)
  24:13
traumatic (1)
  28:18
trick (1)
  6:17
trigger (1)
  17:9
trying (6)
  12:8;16:19,21;25:6;
  28:7;29:5
turn (1)
  7:6
turned (1)
  16:25
Turner (1)
  36:20
turning (1)
  24:21
two (5)
  9:25;10:12;20:24;
  23:16;31:10
type (2)
  11:12;31:23

**U**

uh-uh (1)
  3:24
unclear (1)
  24:7
under (2)
  19:3,14
understood (2)
  4:15;12:7
unidentified (1)
  25:15

uniform (2)
  15:25;19:18
unlawful (2)
  33:13,22
up (17)
  14:12;18:23;20:9,10,
  11;23:11;24:3,17,22;
  26:8;27:19;29:12,13,
  14,14;30:8;36:12
use (3)
  4:6;5:25;27:1
Using (1)
  21:19

**V**

valid (1)
  9:4
vehicle (1)
  10:11
verbally (1)
  19:16
verification (1)
  12:16
verify (1)
  11:18
victims (1)
  15:15
video (25)
  18:7,9,10,17,21,25;
  19:1,6,8,10;20:1,2,13,
  21,22;22:6,13,14,19;
  23:14,22;24:12;31:5,
  14;34:13
videotape (2)
  30:22;31:11
violation (2)
  10:19;13:23
voice (1)
  19:9

**W**

wait (2)
  30:12,14
walk (3)
  25:11;29:4;35:20
walked (4)
  14:21;29:7,9;35:19
walking (2)
  25:2;29:18
wall (2)
  14:13,15
wants (1)
  27:19
ward (1)
  8:8
warrant (10)
  6:5,14,18;8:10;
  11:15;12:21;13:14;
  15:9,13;35:12
watch (1)
  24:11

water (1)
  4:6
way (1)
  25:15
weapon (1)
  25:17
weapons (1)
  17:21
weight (1)
  26:14
what's (2)
  10:3;28:11
whatsoever (1)
  11:20
WHEREUPON (1)
  38:2
whole (1)
  22:1
Whose (2)
  19:9;21:5
Williams (19)
  3:18;7:8,10,22;8:21;
  9:8;10:15,16,24;11:2,
  3;12:3;13:15;16:18;
  25:14;27:11,12;31:21;
  35:16
Williams' (2)
  11:19;15:6
window (3)
  14:2,8,15
windows (4)
  13:5;14:17,23;15:3
within (2)
  26:23;29:1
without (5)
  30:15;32:21;35:21;
  36:20,24
Witness (2)
  3:1;7:15
word (2)
  32:23,23
work (2)
  37:9,15
worked (1)
  5:14
worry (1)
  32:24
writing (1)
  36:12
wrong (1)
  37:15

**Y**

years (3)
  5:15;9:25;10:12
yelling (5)
  16:7,24,25;21:21,22
young (1)
  21:11

**1**

1 (1)
  5:21
10 (7)
  23:11,13,23;24:3,11,
  18,23
100 (2)
  14:3,4
10-second (1)
  20:11
17 (2)
  7:21;8:22
17th (2)
  5:16;7:7

**2**

2:05 (1)
  3:1
2:50 (1)
  38:2
2019 (1)
  5:22
2020 (4)
  5:16;7:7,21;8:22
210 (1)
  26:16
22:25:16 (1)
  18:18
22:25:55 (1)
  19:2
22:26:01 (1)
  19:10
22:26:09 (1)
  20:2
22:26:10 (1)
  20:16
22:26:13 (1)
  20:23
22:26:21 (1)
  22:7
22:26:43 (2)
  23:4,10
22:26:52 (1)
  23:15
23 (1)
  24:23

**3**

30 (1)
  29:1
33 (4)
  23:23;24:7,20,22
39 (1)
  24:23

**4**

40 (1)
  24:24
42 (2)
  23:25;24:9

**5**

50 (1)
  23:20
51 (1)
  23:20
52 (1)
  24:2

**6**

6 (2)
  9:14;26:15

**In The Matter Of:**

*STATE OF INDIANA V.*

*LANZELL WILLIAMS, III*

---

*JONATHAN SNODGRASS*

*April 8, 2022*

---

*ACCURATE REPORTING OF INDIANA*

*543 PONDS POINTE DRIVE*

*CARMEL, INDIANA 46032*

*317.848.0088*

*accuratereportingofindiana@gmail.com*

Original File 04082022 SNODGRASS(1).txt

Min-U-Script® with Word Index

STATE OF INDIANA V.
LANZELL WILLIAMS, III

JONATHAN SNODGRASS
April 8, 2022

---

**Page 1**

```
 1   STATE OF INDIANA
 2   COUNTY OF DELAWARE
 3
 4
 5           IN THE DELAWARE COUNTY CIRCUIT COURT 1
 6               CAUSE NO. 18C01-2007-F5-000116
 7
 8
 9   STATE OF INDIANA,
                      Plaintiff,
10            vs.
11   LANZELL WILLIAMS, III,
                      Defendant.
12
13
14               The oral deposition of
15
16               JONATHAN SNODGRASS,
17
18   was taken by counsel for the defendant on
     the 8th day of APRIL, 2022, at 3100 South Tillotson
19   Avenue, Suite 270, Muncie, Indiana, and reported by me,
20   Marjorie A. Addington, Notary Public in and for the
21   County of Hamilton, State of Indiana, CM, CSR.
22
23
24          ACCURATE REPORTING OF INDIANA, LLC
                   543 PONDS POINTE DRIVE
25                 CARMEL, INDIANA  46032
                      (317) 848-0088
```

**Page 2**

```
 1               APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4
 5   Mr. Steve Sneed
     Delaware County Prosecutor's Office
 6   3100 South Tillotson Avenue
     Suite 270
 7   Muncie, Indiana  47302
 8
 9
     FOR THE DEFENDANT:
10
11   Mr. David M. Seiter
12   Riley Cate, LLC
     11 Municipal Drive
13   Suite 320
     Fishers, Indiana  46038
14
15
16           I N D E X
17
     Direct Examination by Mr. Seiter-Page 3
18
19
20
21
22
23
24
25
```

**Page 3**

1      (Witness is sworn at 1 p.m.)
2
3  DIRECT EXAMINATION BY MR. SEITER:
4  Q.  Thank you, sir.  Would you please state your name
5    for the record?
6  A.  Jonathan Snodgrass.
7  Q.  And do you prefer to be called "Mr. Snodgrass,"
8    "Jonathan," "Officer Snodgrass"?  Do you have a
9    preference?
10 A.  Actually, I usually go by my middle name which is
11   "David."
12 Q.  "David," okay.
13 A.  Yeah.
14 Q.  And have you ever been deposed before?
15 A.  Yes.
16 Q.  All right, I assume you had given your
17   profession, but --
18 A.  Right.
19 Q.  First of all let me introduce myself, my name is
20   Dave Seiter and I'm an attorney and I've been hired by
21   Lanzell Williams.
22 A.  Okay.
23 Q.  I do not represent Tiffanie Williams, I only
24   represent Lanzell.
25 A.  Okay.

**Page 4**

1  Q.  And just a few rules for the deposition.  First
2    of all it's important to give clear answers, so --
3  A.  Yes.
4  Q.  -- if you say "uh-huh or "uh-uh" I'm going to ask
5    you to clarify.  It's important that we don't
6    interrupt each other, even though you probably know
7    exactly what I'm going to ask and I know what you're
8    probably going to say, I'm going to let you get your
9    whole answer out because that's what I'm here for
10   today is to find out what you have to say.
11 A.  Sure.
12 Q.  If you need to take a break at any time feel free
13   to ask to take a break, go get water, walk around, you
14   know, use the bathroom, whatever you need to do, the
15   only thing I ask is that you answer the last question
16   posed to you before we take that break.
17 A.  Sure.
18 Q.  And then finally, despite doing this for a
19   living, I don't always ask the best questions, so if I
20   ask a question that you don't understand please let me
21   know and I'll either repeat or rephrase it.  If you
22   answer the question, I'm going to assume that you
23   heard me, that you understood me and that you answered
24   it honestly, is that fair?
25 A.  Yes.

STATE OF INDIANA V.
LANZELL WILLIAMS, III

JONATHAN SNODGRASS
April 8, 2022

---

Page 5

1  Q.  All right.  Did you review anything prior to your
2     deposition today?
3  A.  Just my part of the case.
4  Q.  Okay, and I see you have what appears to be your
5     report that you wrote on the case.
6  A.  Yes, it's the narrative --
7  Q.  Okay.
8  A.  -- from that report.
9  Q.  And I'll ask you about that narrative as well,
10    but I may ask you first if you remember certain facts.
11    If you need to refer to your report, you may do so,
12    but I want to make sure that we know on the record
13    that you're referring to your report.
14 A.  Okay.
15 Q.  All right.  Where are you employed, sir?
16 A.  The Eaton Police Department for the Town of
17    Eaton.
18 Q.  And how long have you been employed there?
19 A.  As of March 26th of this year it will be 23
20    years.
21 Q.  Were you so employed on July 17th of 2020?
22 A.  Yes.
23 Q.  Did you complete an academy prior to going to
24    that job?
25 A.  Yes, at the Indiana Law Enforcement Academy.

---

Page 6

1  Q.  Okay, and how long ago was that?
2  A.  Oh, gosh, 1999 to 2000.
3  Q.  Okay, and do they teach you about constitutional
4     principles?
5  A.  Yes.
6  Q.  And they teach you about warrant procedures?
7  A.  Yes.
8  Q.  And do you have updates through training through
9     your department on those issues?
10 A.  Yes.
11 Q.  And did you prepare a Probable Cause Affidavit
12    that was filed with this court?
13 A.  Yes.
14 Q.  And I say "this court," the court in which this
15    case is set.
16 A.  I understand.
17 Q.  Okay, and have you reviewed it?
18 A.  Yes.
19 Q.  And is the information accurate?
20 A.  Yes.
21 Q.  Did you make any false statements in what you
22    presented to the court?
23 A.  No false statements, no, not intentionally.
24 Q.  Did you also prepare a written police department
25    report?

---

Page 7

1  A.  Yes.
2  Q.  And are there any false statements in any of your
3     police reports?
4  A.  No.
5  Q.  And on that day did you wear, "that day" being
6     July 17, 2020, did you wear a body-worn camera?
7  A.  I did.
8  Q.  And had you watched that body-worn camera
9     coverage prior to writing your Probable Cause
10    Affidavit or your police reports?
11 A.  No.
12 Q.  Why not?
13 A.  Well, one is the availability to watch it, it's
14    encrypted on to our system, and, two, I did the report
15    from memory right after the incident occurred.
16 Q.  Okay, and have you watched it since you've
17    written the report?
18 A.  I have not watched it in its entirety, no.  I
19    have watched bits and pieces.
20 Q.  All right.  Did you watch the entry into the
21    Williams' residence?
22 A.  Yes.
23 Q.  And did you make any corrections to either your
24    Probable Cause Affidavit or your police reports or
25    file any supplemental reports after watching the

---

Page 8

1     video?
2  A.  I don't believe so.
3  Q.  And you understand that your Probable Cause
4     Affidavit and police reports are made under oath just
5     like your testimony here today?
6  A.  Yes.
7  Q.  All right, so let's turn your attention back to
8     July 17th, 2020.  On that date did you respond to a
9     complaint from Jayda Williams?
10 A.  Yes.
11 Q.  And did you know Jayda Williams before this date?
12 A.  No.
13 Q.  Do you know if she's ever made any complaints
14    before?
15 A.  I don't know.
16 Q.  Okay.
17 A.  I don't have that information.
18 Q.  All right, and did you also meet with a Brittney
19    Sparks?
20 A.  Yes.
21 Q.  Did you know Brittney Sparks before this date?
22 A.  No.
23 Q.  And do you know if she's ever made any complaints
24    before?
25 A.  I have no knowledge of that.

---

STATE OF INDIANA V.
LANZELL WILLIAMS, III

JONATHAN SNODGRASS
April 8, 2022

Page 9

1  Q. Did you ever identify either of these people with
2  their photo ID to confirm that they are who they said
3  they were before you went to Tiffanie Williams'
4  residence?
5  A. No, I don't believe so.
6  Q. Prior to July 17th did you know Tiffanie
7  Williams?
8  A. Yes.
9  Q. And how did you know Tiffanie?
10 A. Multiple dealings in the law enforcement
11 capacity.
12 Q. Had you formed any opinion as to her mental
13 status?
14 A. Yes.
15 Q. And what was that opinion?
16 A. She has a proven or a known medical issue,
17 traumatic brain injury which causes some psychological
18 issues.
19 Q. And prior to July 17th, 2020 did you know Lanzell
20 Williams?
21 A. Yes.
22 Q. And how did you know Lanzell?
23 A. Again with brief law enforcement dealings.
24 Q. Did you have any reason to be concerned over his
25 mental status?

Page 10

1  A. No.
2  Q. And did you have any reason to be concerned over
3  his criminal history?
4  A. No.
5  Q. Now, the reason for your arrival to speak with
6  Jayda Williams was over a protective order, is that
7  correct?
8  A. Yes.
9  Q. And who did you understand that protective order
10 to be against?
11 A. Jayda was the petitioner and Tiffanie Williams
12 was the respondent.
13 Q. And she indicated that Tiffanie Williams had been
14 yelling hateful things at Brittney Sparks?
15 A. Among other things, yes.
16 Q. Okay, what are the other things?
17 A. She could hear from outside Tiffanie yelling
18 saying that she was going to be the cause of her
19 baby's death, unborn child's death, other lewd and
20 lascivious comments and --
21 Q. Sure, and did you ask Jayda and Brittney to write
22 out written statements?
23 A. I did.
24 Q. And did you read their statements prior to
25 confronting Tiffanie?

Page 11

1  A. Yes.
2  Q. And did you ask any follow-up questions regarding
3  these statements?
4  A. I would have to refer to my notes, it's been two
5  years, almost two years.
6  Q. If you have any notes that reflect that, feel
7  free.
8  A. Okay. What was the totality of the question
9  again?
10 Q. Did you ask any follow-up questions after
11 receiving those statements?
12 A. I don't believe so.
13 Q. Okay.
14 A. Wait, yes, I did, I asked if they had copies of
15 the video.
16 Q. Okay, and did they?
17 A. They stated yes, but we did not receive them.
18 Q. Did you ever look at video that they had?
19 A. Yes.
20 Q. And when did you look at that?
21 A. Just after the event, after leaving Apartment No.
22 3 and then going down to Apartment No. 12.
23 Q. Okay, so you didn't look at the video until after
24 you had already confronted Tiffanie Williams?
25 A. Correct.

Page 12

1  Q. All right. I'm going to show you what I've
2  marked for identification purposes as Defendant's A
3  and B. I understand B is a little bit hard to read
4  because of the color ink used.
5  A. Sure.
6  Q. But do those appear to be the reports of Brittney
7  Sparks and Tiffanie -- I'm sorry, and Jayda Williams?
8  A. Yes, the witness statements, yes.
9  Q. Okay, and are those the only written statements
10 that you had from them prior to going down and
11 confronting Tiffanie?
12 A. Yes.
13 Q. All right. In either of those documents does it
14 tell you what day or what time the alleged violation
15 of the protective order occurred?
16 A. I do not believe so.
17 Q. All right, and you didn't follow up with a
18 question on that?
19 A. No.
20 Q. All right. Does it say whether or not those
21 incidences occurred before she received service of a
22 protective order?
23 A. It does not say that, no.
24 Q. Does it say that they knew she had received a
25 copy of the protective order?

STATE OF INDIANA V.
LANZELL WILLIAMS, III

JONATHAN SNODGRASS
April 8, 2022

Page 13

1 A. In these statements, no, it does not say that.
2 Q. And did you ask those follow-up questions at all?
3 A. I believe I asked Jayda if she knew if Tiffanie
4 had been served and she was unaware.
5 Q. Okay. Now Jayda had some folded paperwork that
6 she told you was the protective order, did you ever
7 look at it?
8 A. I don't believe so.
9 Q. Did you see a copy of the protective order before
10 going and confronting Tiffanie Williams?
11 A. No, but I did confirm through dispatch and the
12 Indiana Insight that there was one in effect.
13 Q. Okay. I'm going to show you what I'll mark for
14 identification purposes as Defendant's Exhibit C. Is
15 this what you would have -- Well, first of all, can
16 you identify what that exhibit is?
17 A. It appears to be call notes, dispatch notes.
18 Q. And is that what you would've received prior to
19 speaking with Jayda Williams?
20 A. Some of it, yes.
21 Q. Okay. Is there additional information that you
22 would've gotten that is not contained on that report?
23 A. Based totally on the dispatch notes?
24 Q. No, I'm asking did you get anything concerning
25 the protective order that is not included in that

Page 14

1 note?
2 A. No, I don't believe so.
3 Q. Okay, and reading from there it appears about
4 five, six, seven, eight lines down that it mentions
5 that there's a "respondent Tiffany Williams" with a
6 "Y" and a "Jayda Williams" effective 7-10. Is that
7 what you're referring to as the protective order
8 information?
9 A. Yes.
10 Q. Okay, and the Tiffanie Williams you know, is that
11 how she spells her name?
12 A. I'm assuming yes. I'm not a hundred percent.
13 Q. Okay. Are you aware of how many Tiffany Williams
14 there are in Insight?
15 A. I have no way to know that.
16 Q. And this just tells you when the order was
17 issued, it doesn't tell you when it was served, is
18 that correct?
19 A. Correct.
20 Q. Now, at one point it appears on the video that
21 you did ask Jayda if the protective order had been
22 served and it's consistent with your testimony here
23 today, correct?
24 A. Yes.
25 Q. All right. Why is it important if it's served or

Page 15

1 not?
2 A. For knowledge of the protective order.
3 Q. Okay, so in other words, invasion of privacy is a
4 specific intent crime and she would have to have
5 knowledge there's a protective order in order to
6 knowingly violate it?
7 A. Correct.
8 Q. All right, and so if she had not been served,
9 would there have been a crime with her having
10 communications even though a protective order was
11 issued?
12 A. Yes.
13 Q. How would there be a crime if she didn't have
14 knowledge?
15 A. There's still laws that depict threatening
16 manners and harassment and --
17 Q. Okay, so she might've been guilty of intimidation
18 but not --
19 A. Correct.
20 Q. -- invasion of privacy?
21 A. Correct.
22 Q. Okay. Now, when you asked Jayda if a protective
23 order had been served, she did tell you that she saw a
24 sheriff there, do you remember that comment?
25 A. I do not remember that.

Page 16

1 Q. Okay. I mean do you want to see it on video? I
2 can show it to you.
3 A. If you say it's there, it's probably there.
4    MR. SEITER: Just for the record, I had it marked
5 at 22:14:45.
6    MR. SNEED: (Nods head affirmatively.)
7 Q. Would you believe that that meant that somebody
8 from the Delaware County Sheriff's Office had been to
9 Tiffanie's house?
10 A. Yes.
11 Q. Okay, and you responded "So she had been served"?
12 A. To my knowledge, yes.
13 Q. Okay, why did you jump to that conclusion?
14 A. Multiple reasons, the fact that the protective
15 order was in effect at the time when I requested that
16 information, they said it was, the fact that Jayda had
17 said that she had seen a sheriff's deputy there and
18 placed papers in the door, and then the fact that on
19 our approach there were no papers in the door or
20 anything in the doorway.
21 Q. Okay, but you didn't ask the follow-up question
22 if it was a Delaware County sheriff?
23 A. No.
24 Q. You didn't ask her how she knew it was a sheriff?
25 A. No.

STATE OF INDIANA V.
LANZELL WILLIAMS, III

JONATHAN SNODGRASS
April 8, 2022

---

Page 17

1  Q.  You didn't ask her if the word "there" meant
2  Tiffanie's address?
3  A.  No.
4  Q.  You didn't ask if the sheriff was there before or
5  after the incident?
6  A.  No.
7  Q.  You didn't contact the sheriff's department to
8  find out if they had been to Tiffanie's?
9  A.  No.
10  Q.  You didn't contact the sheriff to verify if the
11  protective order had been served?
12  A.  No.
13  Q.  You didn't contact dispatch or any other person
14  to find out prior to confronting Tiffanie Williams as
15  to whether or not the protective order had been
16  served?
17  A.  No.
18  Q.  And so you left Jayda Williams' house and went
19  directly to Tiffanie's house without ever confirming
20  there was a served protective order?
21  A.  Correct, I did not confirm service.
22  Q.  Okay.  Now you mentioned Insight database
23  earlier, I'm assuming you've used it before?
24  A.  Yes.
25  Q.  And what information does that tell you?

---

Page 18

1  A.  Protective Order Registry is the access level
2  that I have for that site.
3  Q.  I'm going to show you what's been marked for
4  identification purposes as Defendant's Exhibit D.  Do
5  you recognize that picture of that website where
6  that's from?
7  A.  Yes.
8  Q.  Okay, where would that be from?
9  A.  mycourts.IN.gov.
10  Q.  Okay, and is that the same Insight website where
11  that information would be available?
12  A.  Yes, I believe so.
13  Q.  All right, and if you'll take a look at Exhibit
14  C, does that number on that protective order match up
15  with the same protective order that you were given by
16  dispatch?
17  A.  Yes.
18  Q.  And what day does that show that Tiffanie
19  Williams had been served on?
20  A.  July 10th.
21  Q.  Okay, served on July 10th?
22  A.  It says "Effective," oh, I'm sorry, July 17th.
23  Q.  Okay.  Do you know if that was the service that
24  your officers gave her after she had been arrested or
25  was that service entered by somebody beforehand?

---

Page 19

1  A.  I can't answer that, I don't know.  It was not
2  our officers, our officers do not enter that
3  information.
4  Q.  Okay.  I'm going to show you what's been marked
5  for identification purposes as Defendant's Exhibit E.
6  Do you recognize that that's from the same Insight
7  website?
8  A.  I have not seen that page personally, no, but --
9  Q.  Does it appear to be from the same --
10  A.  It appears, yes.
11  Q.  All right, and it looks like there are Tiffany
12  Williams in different counties?
13  A.  Yes.
14  Q.  Can you point to any one detail in Jayda
15  Williams' story that you corroborated before going to
16  Tiffanie's house?
17  A.  Checking with dispatch to see if there was a
18  protective order in effect.
19  Q.  Okay, and that was against "a" Tiffany Williams?
20  A.  Correct.
21  Q.  Did you have identifying factors that dispatch
22  gave you as far as age, date of birth, white female,
23  black female?
24  A.  Tiffanie Williams is in our database and -- No, I
25  have no -- I'm not the one that ran that report, so

---

Page 20

1  no.
2  Q.  Okay, and you didn't do anything to corroborate
3  what time these alleged allegations happened, if they
4  happened before or after service?
5  A.  No, I did not.
6  Q.  All right.  Did you see Tiffanie outside of her
7  house when you walked from Jayda's house to Tiffanie's
8  house?
9  A.  No.
10  Q.  And you knocked on her door which you believe to
11  be her residence?
12  A.  Yes.
13  Q.  And how did you know that to be her residence?
14  A.  From previous law enforcement experience.
15  Q.  Okay, and is it a solid door?
16  A.  Yes.
17  Q.  No windows in the door?
18  A.  No.
19  Q.  Is there a peephole visible in the door?
20  A.  Yes.
21  Q.  Was it covered up by any decorations or anything
22  at that time?
23  A.  Not that I believe.
24  Q.  And you knocked at the door it looks like on the
25  video it says 22:25:15 but that doesn't jibe with

---

STATE OF INDIANA V.
LANZELL WILLIAMS, III

JONATHAN SNODGRASS
April 8, 2022

---

**Page 21**

1    dispatch, so I'm assuming the time on your bodycam is
2    off?
3    A.   Yeah, it could be.
4    Q.   Okay, that happens, I understand.  And when you
5    knocked on the door eventually a woman opened it and
6    immediately closed the door before you could even
7    finish saying "Hey, what's up?"
8    A.   Yes.
9    Q.   All right.  Did the door close flush with the
10   frame and then you opened it?
11   A.   Yes.
12   Q.   Is there any reason why you would state in your
13   Probable Cause Affidavit, quote, Due to fresh pursuit
14   I stopped her from shutting the door"?
15   A.   Yes, that was a mistake on my part.  There was a
16   lot going through my head at that time, trying to
17   process previous dealings with Tiffanie, thought
18   processes of obtaining a warrant versus entering the
19   residence due to dangers, among other factors,
20   possibly some tunnel-vision, I at the time perceived
21   that I got to the door before it fully shut, but I do
22   know that it did shut before I reached the door.
23   Q.   Is there any reason why you've never corrected
24   this either in your report or the Probable Cause
25   Affidavit?

**Page 22**

1    A.   There's no reason, no.
2    Q.   Now, did you know who the woman was when you
3    first saw her?
4    A.   Yes.
5    Q.   Okay, and how did you know?
6    A.   Again previous law enforcement dealings.
7    Q.   And you did not have a warrant to arrest Tiffanie
8    Williams at that time, correct?
9    A.   Correct.
10   Q.   She didn't do anything that would make you
11   believe you had her consent to enter the house,
12   correct?
13   A.   Correct.
14   Q.   All right, and you wrote that you entered the
15   house under the theory of hot pursuit, is that
16   correct?
17   A.   Yes.
18   Q.   All right, and did you receive training on hot
19   pursuit at the Academy?
20   A.   Yes.
21   Q.   And have you received training on hot pursuit at
22   your department?
23   A.   Yes.
24   Q.   Can you tell me what "hot pursuit" means to you?
25   A.   The pursuit of a suspect into a dwelling or

**Page 23**

1    property after a crime has been committed to
2    incarcerate or detain that suspect.
3    Q.   And you did not see her commit a criminal act in
4    your presence?
5    A.   Correct.
6    Q.   She wasn't outside and then retreated into her
7    dwelling when you approached?
8    A.   Correct.
9    Q.   She was in her house and she did not step outside
10   when you knocked?
11   A.   Correct.
12   Q.   And you actually had to turn the handle on her
13   door to enter the house after the door had been
14   closed?
15   A.   Yes.
16   Q.   And you did not tell her prior to closing the
17   door that she was under arrest?
18   A.   I didn't have a chance, no.
19   Q.   And you didn't tell her she was a suspect before
20   she closed the door?
21   A.   There was not enough time.
22   Q.   You didn't tell her you needed to talk to her
23   before she shut the door?
24   A.   Correct.
25   Q.   How many sides of Tiffanie's apartment have

**Page 24**

1    either a door or a window?
2    A.   Two.
3    Q.   And that would be the front side where the door
4    is and then the side --
5    A.   To the rear.
6    Q.   -- immediately parallel, right?
7    A.   Correct.
8    Q.   Okay, and so the other perpendicular side one is
9    up against an apartment with no doors or windows?
10   A.   Correct.
11   Q.   And the other side just has no doors or windows
12   on the end?
13   A.   Correct.
14   Q.   Okay, and so basically two officers could cover
15   all the entrances and exits of that building?
16   A.   Yes.
17   Q.   How many officers did you have with you at that
18   time?
19   A.   Two others.
20   Q.   So a total of three?
21   A.   Yes.
22   Q.   Is there anything that prevented you from
23   obtaining a warrant before going into the home of
24   Tiffanie Williams?
25   A.   Yes.

---

STATE OF INDIANA V.
LANZELL WILLIAMS, III

JONATHAN SNODGRASS
April 8, 2022

Page 25

1  Q.  What?
2  A.  Previous history dealing with Tiffanie Williams.
3  Q.  Okay, in what way?
4  A.  Her erratic behavior, the knowledge of her owning
5    and possessing firearms, weapons, the availability of
6    those weapons, the danger that would occur if she
7    obtained those weapons to the officers, the
8    surrounding community.  If officers left that area or
9    potentially froze that scene 'til the time to obtain a
10   warrant it could've escalated, which Tiffanie does
11   quite often with other events.
12  Q.  Are you familiar with the Laird Law in Indiana?
13  A.  I am.
14  Q.  And has any petition ever been filed if you
15   believe that she's mentally unstable and has firearms
16   to seize those firearms?
17  A.  I believe we have tried to submit -- We have
18   submitted to the prosecutor's office paperwork, yes.
19  Q.  And nothing's ever been decided by a court?
20  A.  I do not believe so.
21  Q.  Did she tell you she was going for a gun?
22  A.  No.
23  Q.  Did you see a gun in her possession when she
24   opened the door?
25  A.  No.

Page 26

1  Q.  If you got a warrant, you wouldn't have to
2    execute it right at that moment, would you?
3  A.  No.
4  Q.  You could've waited for her to leave the house?
5  A.  Yes.
6  Q.  Could've found her somewhere else in public?
7  A.  Yes.
8  Q.  Could've pulled her over during a traffic stop?
9  A.  Yes.
10  Q.  Other than your uniform you didn't announce that
11   you were the police when you entered the home, is that
12   correct?
13  A.  Correct.
14  Q.  And when you entered the home Tiffanie began to
15   yell and scream and ordered you out of her house?
16  A.  Yes.
17  Q.  Did she yell for her husband, Lanzell?
18  A.  Yes.
19  Q.  Your Probable Cause Affidavit states, quote, I
20   stated we have probable cause to effect an arrest for
21   her invasion of privacy.  She then tried to run down
22   the hallway and I grabbed her arm.  She was screaming
23   for her husband, Lanzell Williams."  Is that statement
24   true?
25  A.  Yes.

Page 27

1  Q.  So based on this statement you had already
2    announced that you had probable cause to effect an
3    arrest for her invasion of privacy prior to her
4    running down the hallway and screaming for her
5    husband?
6  A.  When I entered the residence and approached her,
7    that's what I said.
8  Q.  I'm going to play a little bit of video for you,
9    but do you recognize this as being from your body
10   camera?
11  A.  Yes.
12  Q.  All right, and I'm going to skip forward to where
13   you're actually in with Tiffanie, and for the record
14   I'm going to start the video where it says "22:25:25"
15   and this is where you're knocking at the door, is that
16   correct?
17  A.  I believe so, yes.
18  Q.  Okay, so at that point you had said "Hey, what's
19   up?" and she closes the door --
20  A.  Yes.
21  Q.  -- and now you're going to open the door, is that
22   correct?
23  A.  Correct.
24  Q.  All right, let's continue playing from that
25   point.

Page 28

1    (video plays.)
2  Q.  Okay.  Did you tell her that you had probable
3    cause for her arrest or did you just tell her "turn
4    around"?
5  A.  I just told her to turn around.
6  Q.  Why would you write in your Probable Cause
7    Affidavit that you had told her that you had an effect
8    for her arrest for invasion of privacy?
9  A.  I thought that's what I said.
10  Q.  All right.  You had a chance to review the video.
11   Have you ever gone back and corrected your Probable
12   Cause Affidavit or your police report?
13  A.  No.
14  Q.  Why not?
15  A.  I had not actually watched this video.
16  Q.  Okay, well, let's continue watching it.
17    (video plays.)
18  Q.  Okay, you hear the officer saying "Drop the gun"
19   and then did you also see a finger point?
20  A.  Yes.
21  Q.  Do you know if that was his right hand or his
22   left hand pointing?
23  A.  I believe it was his right hand.
24  Q.  Okay, so you think it was this hand or you think
25   it was this hand?

Page 29

1  A. Honestly --
2  Q. We can show a different angle, I'm not trying to
3    trick you, I'm just --
4      MR. SNEED: Or I think you can have a 10-second
5    back if you want to show him again.
6      MR. SEITER: Sure.
7      (video plays.)
8  Q. At any point during that did you see Lanzell
9    Williams point his firearm at you?
10 A. Yes.
11 Q. You didn't turn to face it, though?
12 A. I had ahold -- I was trying to contain her, I had
13   him coming this way, so I was positioned to where I
14   could kind of deal with the issue in front of me.
15 Q. Okay, and it's your testimony that he physically
16   pointed the firearm at you or did he have it down by
17   his side?
18 A. No, he physically had the gun pointed at me.
19 Q. Can you show me how he did that?
20 A. He had it up like this.
21 Q. Okay, so I'm showing that you had your right arm
22   out and extended away from the body, correct?
23 A. Yes.
24 Q. Okay. Have you reviewed Officer Storie's vantage
25   point?

Page 30

1  A. No.
2  Q. And just so we're clear, Officer Storie was there
3    with you at that time, is that correct?
4  A. I believe he arrived at Jayda's house after I
5    did.
6  Q. Okay, but at the time you entered Tiffanie's he's
7    with you?
8  A. Yes.
9  Q. So I'm going to go back up to the point where you
10   knock, and his camera doesn't have the timestamp, so
11   looking down at the bottom, this is 10:58 when she
12   opens the door and closes it.
13     (video plays.)
14 Q. Do you see where the gun is in that picture?
15 A. It's down by his side.
16 Q. In what hand?
17 A. His right hand.
18 Q. All right, and I believe you may have talked to
19   the court reporter when I was playing the video the
20   first time, were you admitting that he was pointing
21   with his left hand?
22 A. Yes.
23 Q. Okay, so if we stop the --
24     MR. SNEED: Can we have a point of clarity?
25     MR. SEITER: Sure.

Page 31

1      MR. SNEED: When you're saying "pointing" because
2    we're talking about -- we've talked about two
3    different pointings.
4      MR. SEITER: Okay.
5      MR. SNEED: When you say "pointing with his left
6    hand," can you --
7      MR. SEITER: Sure, let me clarify.
8  Q. So right now I stopped the video at 11:17, so
9    we're looking at a stillshot. It looks like we have
10   the torso of Tiffanie Williams in the middle of the
11   frame, is that correct?
12 A. Yes.
13 Q. And then we have what appears to be the torso of
14   an officer, is that you, sir?
15 A. It is.
16 Q. Okay, and then behind you over your right
17   shoulder --
18     MR. SEITER: I see a light flashing. We can go
19   off the record.
20     (Off the record.)
21 Q. And then behind you is the torso of Lanzell
22   Williams?
23 A. Yes.
24 Q. All right, and where does his left hand appear to
25   be if you can --

Page 32

1  A. At shoulder level outreached.
2  Q. Okay, so if we match that up with your video,
3    that would be where we saw the fingers coming in,
4    correct?
5  A. Correct.
6  Q. All right, and so where is the gun? The gun is
7    not in the left hand, right?
8  A. No, it's in his right hand.
9  Q. Okay, so is there a point after this that he
10   points the gun at you?
11 A. No, it was prior to this as he exited the door.
12 Q. Okay. When he first came out the door the gun
13   was raised?
14 A. Yes.
15 Q. All right, and then he lowers the gun apparently
16   because it's lowered at this point?
17 A. Correct.
18 Q. All right, so within seconds --
19 A. He does lower the weapon.
20 Q. -- he came out with the gun he immediately
21   lowered it?
22 A. Correct.
23 Q. Seeing probably your uniform, right?
24 A. Right.
25 Q. Do we have any video evidence of him pointing

STATE OF INDIANA V.
LANZELL WILLIAMS, III

JONATHAN SNODGRASS
April 8, 2022

Page 33

1  that when he comes out of the door?
2  A.  I'm not sure.  Like I said, I don't have any -- I
3  don't have access to all the video.
4  Q.  Okay.  Did Officer Storie have the best view of
5  that hallway at that moment?
6  A.  I'm not sure where Officer Conner is and his
7  video, but, yes, I believe so.
8  Q.  I'm going to continue to play Officer Storie's
9  video since that has you in it.
10  A.  Sure.
11    (video plays.)
12  Q.  All right, now, at this point it appears that the
13  officer, the officers, the other two officers, are
14  controlling Tiffanie, you don't have a hand on her, is
15  that correct?
16  A.  Correct.
17  Q.  Who are you closer to, Lanzell or Tiffanie?
18  A.  I'm right in the middle.
19  Q.  Okay, and are you at a point where you could put
20  hands on Lanzell if you needed to?
21  A.  Yes.
22  Q.  If you believed he committed a crime of pointing
23  a firearm at an officer, why didn't you arrest him at
24  that moment?
25  A.  Due to the significant nature of what was going

Page 34

1  on, we were trying to de-escalate the situation as
2  quickly as possible.
3  Q.  I'm sorry, you're trying to gaslight it?
4  A.  De-escalate it.
5  Q.  De-escalate it, thank you, opposite meaning.
6  A.  Yes, de-escalate the situation as quickly as
7  possible and by doing so taking her into custody
8  would've done that, and like you said in watching the
9  video at that point he had lowered the weapon, so she
10  was more of the aggressor at that point than he was.
11  Q.  Do you feel at that moment that he had
12  intentionally pointed a firearm at you or do you think
13  that he was coming out to protect his wife and once he
14  realized you were cops he lowered the weapon?
15  A.  I have no idea to know what he was thinking.
16  Q.  Okay, but as far as what you were thinking at the
17  time, you didn't neutralize him as a threat even
18  though he had a firearm?
19  A.  Yeah, I registered it as a threat.
20  Q.  Okay.  What did they train you in the Academy
21  regarding having people in a hostile situation with
22  firearms?
23  A.  That we go to threat.
24  Q.  Okay, and so why didn't you go to threat on this
25  time?

Page 35

1  A.  I'm not sure at what point in the video, but I
2  did see that there was a juvenile that was behind
3  Lanzell that kind of kept popping out --
4  Q.  Okay.
5  A.  -- and the threat possibility of that juvenile
6  being injured was also high.
7  Q.  Okay, well, let's continue to watch then.
8    (video plays.)
9  Q.  Okay, now, Lanzell is still yelling at you, is
10  that correct?
11  A.  Correct.
12  Q.  All right, and he's yelling that you didn't have
13  a right to push his door open?
14  A.  Correct.
15  Q.  And you're still focused on Lanzell at this point
16  more than Tiffanie, although you're probably watching
17  both, right?
18  A.  I am.
19    (video plays.)
20  Q.  At this point Tiffanie's resisting arrest, fair
21  to say, right?
22  A.  Yes.
23    (video plays.)
24  Q.  Okay.  Where she tells him to go get his camera
25  is I think about where we stopped your video, too,

Page 36

1  right?
2  A.  Yes.
3  Q.  Okay, where does he go to get his camera?
4  A.  I couldn't tell you that.
5  Q.  Does he go to the back of the house?
6  A.  Honestly, I'm not sure.
7  Q.  Does he leave the hallway?
8  A.  I can't remember if he goes to the kitchen or if
9  he goes back to the bedroom.
10  Q.  Okay, so he has a gun, you've identified him as a
11  threat?
12  A.  Yes.
13  Q.  And you know him to either go to the kitchen or
14  the bedroom even though he supposedly pointed a
15  firearm at you?
16  A.  Yes.
17    (video plays.)
18  Q.  All right, can you see Lanzell in this picture
19  where I stop it at 11:55?
20  A.  Yes.
21  Q.  All right, and can you tell if he has the gun in
22  his hands still or does he have cell phones?
23  A.  I can't tell, fairly blurry.
24  Q.  Understood, and I think maybe if I go back to
25  your video it might be a little more clearer because I

STATE OF INDIANA V.
LANZELL WILLIAMS, III

JONATHAN SNODGRASS
April 8, 2022

---

Page 37

1  think we pick up your camera at that point. I'm going
2  to keep playing Officer Storie's video, though.
3      (video plays.)
4  Q. I'm going to back up ten seconds there and I see
5  a -- He walks up. Does he appear to have anything in
6  his left hand?
7  A. It's dark, I can't --
8  Q. Let me play it just a second here and see if that
9  clears up.
10 A. It doesn't appear so, no.
11 Q. All right, and what does he have in his right
12 hand at that point?
13 A. I can't see his right hand.
14 Q. Okay, I'm going to back it up ten seconds,
15 actually I'm going to do it 20.
16     (video plays.)
17 Q. Could you tell where his hand was?
18 A. It appears to be a cell phone in his right hand.
19 Q. Okay, so at that point do you know where the gun
20 is?
21 A. I do not.
22 Q. So it could've been in the room he went to, it
23 could be hidden on him somewhere?
24 A. Correct.
25 Q. But now you have no idea where the threat is even

Page 38

1  though you believe he committed a felony against you?
2  A. Yes.
3      (video plays.)
4  Q. All right, you can see Lanzell move behind the
5  officers. I stopped the video at 12:19. Did you see
6  any gun in that video?
7  A. No.
8  Q. All right, I'm going to keep moving.
9      (video plays.)
10 Q. All right, I'm stopping at 12:26. At this point
11 Lanzell has moved towards the front door, is that
12 correct?
13 A. Correct.
14 Q. Are there any juveniles behind him?
15 A. No.
16 Q. Is there a gun visible?
17 A. No.
18 Q. So if you wanted to detain him at this point, the
19 other two officers had Tiffanie on the ground and you
20 could've detained Lanzell?
21 A. Yes.
22 Q. Did you?
23 A. No.
24 Q. Why not?
25 A. Again, I was more worried about getting Tiffanie

Page 39

1  into custody and detained at that point because she
2  was still not in handcuffs.
3  Q. But your training and experience is you move to
4  the threat, correct?
5  A. Yes.
6  Q. And the threat is the gun?
7  A. At that point there was no longer a threat.
8  Q. Well, the gun could've been picked up by anybody
9  else in the house, correct?
10 A. Correct.
11 Q. So the threat's still the gun?
12 A. Yes.
13 Q. And you did not move to clear the gun?
14 A. No.
15 Q. Did you ever seize the gun?
16 A. No.
17 Q. So the gun's never been in possession of the
18 police department?
19 A. I don't believe so.
20 Q. So how do we know it's actually a firearm?
21 A. Because I know what a firearm is and it was in my
22 face.
23 Q. Are you sure it wasn't a replica of a firearm?
24 A. It was a firearm.
25 Q. Do you know if it's capable of firing a round?

Page 40

1  A. I don't know.
2      (video plays.)
3  Q. Is that Officer Storie that's telling him to step
4  back?
5  A. I believe so, yes.
6  Q. Okay.
7      (video plays.)
8  Q. Okay, so at 13:06 he makes a threat that you guys
9  are being sued, is that correct?
10 A. Yes.
11 Q. He's allowed to leave the house?
12 A. Yes.
13 Q. And he's actually ordered out of his own house,
14 correct?
15 A. He was ordered to step back.
16 Q. Okay, and at this point he could have the gun on
17 him, he might not?
18 A. Correct.
19 Q. So as much as you were concerned about Tiffanie
20 Williams possibly having a gun in his house, you're
21 not worried about Lanzell Williams walking all over
22 the scene potentially having a gun on him?
23 A. Apparently not.
24 Q. Okay, and just so we're clear, that is
25 inconsistent with anything you learned at the Academy

---

STATE OF INDIANA V.
LANZELL WILLIAMS, III

JONATHAN SNODGRASS
April 8, 2022

**Page 41**

1  or any of the training that you learned through your
2  police department?
3  A.  Yes.
4  Q.  Okay.
5      (video plays.)
6  Q.  I want to go back, and we'll see from your video
7  where we stopped, to see if that sheds light on
8  anything else.  Well, actually, no, there's a part
9  here.
10     (video plays.)
11 Q.  Do you remember Officer Storie asking you at any
12 time if you wanted to cuff up Lanzell?
13 A.  No, I don't remember that.
14 Q.  Okay, let's continue to watch, I think it's
15 coming up here shortly.
16     (video plays.)
17 Q.  So I'm pausing again at 13:54.  It looks like
18 Lanzell walked in and walked behind you while you're
19 handcuffing Tiffanie, is that correct?
20 A.  Yes.
21 Q.  And again you had no concern about him coming in,
22 walking in behind you, didn't direct him out,
23 anything?
24 A.  My main focus again was taking Tiffanie into
25 custody.

**Page 42**

1  Q.  Okay, even though he could possibly still have a
2  gun on him?
3  A.  Yes.
4      (video plays.)
5  Q.  If we could identify, who is the officer here
6  with the beard?
7  A.  There's a glare, I'm sorry.
8  Q.  That's all right.
9  A.  Chase Knepper.
10 Q.  Okay, and then who is the other officer that's
11 handcuffing Tiffanie with you?
12 A.  Michael Conner.
13 Q.  Okay.
14     (video plays.)
15 Q.  Did you hear that?
16 A.  Yes.
17 Q.  Go back?
18 A.  Yes.
19 Q.  All right, I'll just play it a little more.
20     (video plays.)
21 Q.  It sounds like he says "Do you want him cuffed
22 up, Dave?"  Is he referring to you?
23 A.  Yes.
24 Q.  Okay, and who is he saying "Do you want him
25 cuffed up?"  Who is he talking about?

**Page 43**

1  A.  Lanzell.
2  Q.  Okay, and how do you respond?
3  A.  I didn't hear.
4  Q.  Okay, let's keep watching.
5      (video plays.)
6  Q.  I'll go back.
7      (video plays.)
8  A.  I can't hear.
9  Q.  Okay.
10 A.  I don't recall that conversation, --
11 Q.  Okay.
12 A.  -- I apologize.
13 Q.  No problem.  And we were going to go back to your
14 video real quick.
15     MR. SEITER: Go off the record for a moment.
16     (A recess was taken.)
17     (video plays.)
18     MR. SEITER: All right, back on the record.
19 Q.  All right.  So, Officer, we're back on the
20 record.  I've got the video of your body camera at
21 22:25:51, I'm going to start and that should show
22 before Lanzell comes down the hallway, I want to see
23 if this adds anything to your narrative.
24     (video plays.)
25 Q.  Okay, so we see where the officer with the beard

**Page 44**

1  is saying "Drop the gun," we can tell that he's
2  pointing a finger.
3  A.  Yes.
4  Q.  And that's the point that we saw in Officer
5  Storie's where he's got it down on the right-hand
6  side, but you're saying that the pointing of the
7  firearm happened before this moment, is that correct?
8  A.  Correct.
9  Q.  And we're currently at 22:26.
10     (video plays.)
11 Q.  So one of the questions I have for you, Officer,
12 is the charge of intimidation involves putting
13 somebody in fear or threatening them as a result of a
14 prior lawful act.  If Lanzell Williams is immediately
15 coming out because he just hears his wife screaming
16 and there's no notification that you are the police,
17 how would he know that he was coming into a scene that
18 was a lawful act based on all the noise that's going
19 on in this video?
20 A.  I wouldn't know that.
21     (video plays.)
22 Q.  Okay, we just saw a little bit of Lanzell, I
23 stopped the video at 22:26:51.  Did you see a gun in
24 his hand?
25 A.  Not at that time, no.

STATE OF INDIANA V.
LANZELL WILLIAMS, III

JONATHAN SNODGRASS
April 8, 2022

Page 45

1  Q.  Okay, so let's go ahead and rewind, we're going
2  to back up 10 seconds and play again.
3  (video plays.)
4  Q.  Okay, what --
5  A.  Cell phone.
6  Q.  Okay, so when we were asking and watching
7  Detective Storie's video or Officer Storie's video and
8  you thought it was a cell phone, did that confirm that
9  for you in your mind?
10 A.  Yes.
11 Q.  Okay, so again at this point, at 22:26:52, we
12 have no idea where the gun went to?
13 A.  Correct.
14 (video plays.)
15 Q.  Okay, so we just heard -- I stopped the video at
16 22:26:57, that's the point where you tell her you have
17 probable cause for invasion of privacy, correct?
18 A.  Yes.
19 Q.  All right, and by this point Lanzell has already
20 come out with his gun, now put the gun back?
21 A.  Correct.
22 (video plays.)
23 Q.  Later in your Probable Cause Affidavit you write
24 "I told him that we were police and we had probable
25 cause to make an arrest.  I told him to put the gun

Page 46

1  down."
2  A.  Yes.
3  Q.  Did you hear that?
4  A.  So when the yelling was -- When we were in the
5  hallway and he first came out with the gun, that's
6  when I told him, I don't know that you could hear me
7  because of the amount of noise and screaming and the
8  other officers yelling, but I did tell him and that's
9  when he finally did lower the weapon is after I told
10 him "Hey, we're here to arrest her, we have probable
11 cause" and that's when he lowered his weapon.
12 Q.  Okay.
13 A.  Like I said, I don't know that you can hear it on
14 the video itself because of the amount of noise in
15 that area.
16 Q.  Now, at one point he does say "I will kick you in
17 the face, bitch."
18 A.  Yes.
19 Q.  Who was he saying that to?
20 A.  I believe Officer Conner.
21 Q.  All right, how do you know that?
22 A.  Because he was referring to Tiffanie resisting on
23 the ground and he had to get her arm, other arm behind
24 her, and based on that action is what he was
25 responding to.

Page 47

1  Q.  All right, and he was saying that in response to
2  what he believed to be an unlawful arrest of his wife?
3  A.  Correct.
4  Q.  All right, and by that time he's no longer
5  holding a firearm?
6  A.  Correct.
7  Q.  All right, and it appears he had two phones in
8  his hand, one that he's recording and one that he's on
9  call with dispatch?
10 A.  Yes.
11 Q.  All right.  Did you hear Lanzell make any other
12 threats against any of the officers other than that
13 comment?
14 A.  Not to my knowledge.
15 Q.  Okay.  In any event, we heard him say "you," not
16 "us," right, in other words he had --
17 A.  In referring to what?
18 Q.  He said "I'm going to kick you in the head."
19 A.  Correct.
20 Q.  Or in the face, I'm sorry, face.  So it would be
21 one person, not everybody, he wasn't threatening to
22 kick everybody's face?
23 A.  I'm assuming, yes.
24 Q.  Okay.  Now, at some point Tiffanie -- or somebody
25 states that she's having a seizure, is that correct?

Page 48

1  A.  Yes.
2  Q.  All right, fair to say you believe that was a
3  fake seizure?
4  A.  Yes.
5  Q.  She comes to you rather quickly and then she asks
6  for her inhaler?
7  A.  I don't know that she ever stopped talking, but,
8  yeah, she did.
9  Q.  Okay, and Lanzell was allowed to walk freely to
10 the back of the house to find her inhaler?
11 A.  Correct.
12 Q.  Even though at this point we still don't know
13 where the gun is?
14 A.  Correct.
15 Q.  EMTs arrived on the scene?
16 A.  Yes.
17 Q.  Lanzell was still free to walk around the house?
18 A.  Yes.
19 Q.  At what point was a decision made to arrest
20 Lanzell?
21 A.  After I had conferred with the other officers, my
22 chief and the prosecutor's office.
23 Q.  Okay, and was that Mr. Sneed that was conferred
24 with?
25 A.  I believe so, yes.

STATE OF INDIANA V.
LANZELL WILLIAMS, III

JONATHAN SNODGRASS
April 8, 2022

---

**Page 49**

1  Q.  If you thought he pointed a firearm at you to
2  intimidate you or even pointed a firearm at you, why
3  did you need to confer with people to make that
4  decision, shouldn't that be obvious?
5  A.  Because of the fine line between -- I understand
6  hearing the noises coming out, defending your wife and
7  your property, which he has the right to do, so that
8  fine line between that and continuing to carry the gun
9  and not putting it down when ordered to.  He had --
10 Q.  Well, wait.
11 A.  He had to be told mul -- Even on video he had to
12 be told multiple times to put the gun down or put it
13 away, and then also I was not sure that he's not
14 allowed to possess a weapon because of other charges
15 out of other counties.
16 Q.  Okay.  Did you find out that it was still okay
17 for him to possess a weapon?
18 A.  Yes.
19 Q.  He was not a serious violent felon, correct?
20 A.  Correct.
21 Q.  And he was not convicted of a felony?
22 A.  Correct.
23 Q.  And he was in his home?
24 A.  Yes.
25 Q.  So he wouldn't have needed a permit?

**Page 50**

1  A.  Correct.
2  Q.  Did you verify that he actually had a permit?
3  A.  No.
4  Q.  Even to this day did you look back to see if he
5  had a permit at the time?
6  A.  No.
7  Q.  Okay.  How many seconds elapsed from the time
8  that you told him to put the gun down that he then had
9  the gun down at the side of his --
10 A.  Just a few seconds.
11 Q.  Okay, and then shortly after that she tells him
12 to go get the camera, right?
13 A.  Correct.
14 Q.  So how long are we talking from the beginning of
15 the time he comes out of the bedroom to the time the
16 camera is -- or the phone is -- I'm sorry, not the
17 phone, the gun is no longer in his hand?
18 A.  Just a few seconds.
19 Q.  But too long for you?
20 A.  When there's a gun in your face it seems like
21 forever.
22 Q.  Okay.  Lanzell wasn't actually arrested until
23 about an hour after you entered the house, is that
24 correct?
25 A.  Correct.

**Page 51**

1  Q.  And even after Tiffanie was arrested and
2  transported to the hospital, so she's out of the
3  scene, Lanzell was still allowed to go back into his
4  house?
5  A.  Correct.
6  Q.  He closed the door?
7  A.  Yes.
8  Q.  And when officers knocked he originally refused
9  to answer the door?
10 A.  Correct.
11 Q.  Did you obtain a warrant for his arrest?
12 A.  No.
13 Q.  Why not?
14 A.  He wound up coming to the door and opened the
15 door and came outside freely.
16 Q.  Did he come outside freely or did officers grab
17 him and pull him outside?
18 A.  I'm not sure, I wasn't a part of that.  I was off
19 to the side I think on the side of the apartment
20 complex.  I'm not sure that I had a view of how he
21 came outside.
22 Q.  Okay.  If the video, specifically even your body
23 cam video, shows officers grabbing him and pulling him
24 out of the house, you'd have no reason to disagree
25 with that, --

**Page 52**

1  A.  Correct.
2  Q.  -- correct?
3  A.  Right.
4  Q.  And Lanzell did not resist arrest when he was
5  grabbed?
6  A.  As far as I know, no.
7  Q.  When he asked why he was being arrested did you
8  hear officers say "Level 6 resisting"?
9  A.  I don't recall that, no.
10 Q.  And was a firearm recovered from him at that
11 time?
12 A.  I'm not aware of any being recovered, no.
13 Q.  But Lanzell had made multiple comments through
14 the prior hour about suing your department?
15 A.  Yes.
16      MR. SEITER: I don't think I have any further
17 questions.
18      MR. SNEED: I don't have any questions.
19      MR. SEITER: Do you want signature?
20      MR. SNEED: Let's go ahead and have signature.
21      (WHEREUPON, at 2:00 p.m. this deposition
22 concluded.)
23
24
25

---

STATE OF INDIANA V.
LANZELL WILLIAMS, III

JONATHAN SNODGRASS
April 8, 2022

Page 53

1
2
3
4       FURTHER DEPONENT SAITH NOT
5
6
7
8       _____
9          JONATHAN SNODGRASS
10      (Subject to any notations made
11      on Errata Sheet.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 54

1                    CERTIFICATE
2
3
4       STATE OF INDIANA
                              ss:
5       COUNTY OF HAMILTON
6
7           I, Marjorie A. Addington, the undersigned Court
        Reporter and Notary Public residing and maintaining
8       offices in the City of Carmel, Hamilton County, Indiana,
        do hereby certify:
9           That at the time and place described above in
10      this transcript, the witness, JONATHAN SNODGRASS, was
        presented before me for administration of an oath of
11      truthfulness which oath I then administered;

12          That I then reported to the best of my ability
        in machine shorthand all of the words spoken by all
13      parties in attendance during the course of the ensuing
        proceedings, including objections, if any, made by all
14      counsel present;

15          That I later reduced my shorthand notes into the
        foregoing typewritten transcript form, which typewritten
16      transcript is a true record to the best of my ability of
        the testimony given by this witness as stated above;

17          That I am not a relative or employee or attorney
        or counsel of any of the parties, nor am I a relative or
18      an employee of such attorney or counsel, and that I am
        not financially interested in this action.

19
20          IN WITNESS HERETO, I have affixed
            my Notarial Seal and subscribed
21          my signature below this 13th day of
            APRIL, 2022.
22

23
        Notary Public
24      County of Residence:  Hamilton        (Seal)
        My Commission Expires on:  JUNE 25, 2023
25      NOTARY #NP0669599

STATE OF INDIANA V.
LANZELL WILLIAMS, III

JONATHAN SNODGRASS
April 8, 2022

**A**

academy (5)
    5:23,25;22:19;34:20;
    40:25
access (2)
    18:1;33:3
accurate (1)
    6:19
act (3)
    23:3;44:14,18
action (1)
    46:24
Actually (10)
    3:10;23:12;27:13;
    28:15;37:15;39:20;
    40:13;41:8;50:2,22
additional (1)
    13:21
address (1)
    17:2
adds (1)
    43:23
admitting (1)
    30:20
Affidavit (10)
    6:11;7:10,24;8:4;
    21:13,25;26:19;28:7,
    12;45:23
affirmatively (1)
    16:6
Again (10)
    9:23;11:9;22:6;29:5;
    38:25;41:17,21,24;
    45:2,11
against (5)
    10:10;19:19;24:9;
    38:1;47:12
age (1)
    19:22
aggressor (1)
    34:10
ago (1)
    6:1
ahead (2)
    45:1;52:20
ahold (1)
    29:12
allegations (1)
    20:3
alleged (2)
    12:14;20:3
allowed (4)
    40:11;48:9;49:14;
    51:3
almost (1)
    11:5
although (1)
    35:16
always (1)
    4:19
Among (2)

    10:15;21:19
amount (2)
    46:7,14
angle (1)
    29:2
announce (1)
    26:10
announced (1)
    27:2
answered (1)
    4:23
Apartment (5)
    11:21,22;23:25;24:9;
    51:19
apologize (1)
    43:12
apparently (2)
    32:15;40:23
appear (5)
    12:6;19:9;31:24;
    37:5,10
appears (9)
    5:4;13:17;14:3,20;
    19:10;31:13;33:12;
    37:18;47:7
approach (1)
    16:19
approached (2)
    23:7;27:6
area (2)
    25:8;46:15
arm (4)
    26:22;29:21;46:23,
    23
around (4)
    4:13;28:4,5;48:17
arrest (14)
    22:7;23:17;26:20;
    27:3;28:3,8;33:23;
    35:20;45:25;46:10;
    47:2;48:19;51:11;52:4
arrested (4)
    18:24;50:22;51:1;
    52:7
arrival (1)
    10:5
arrived (2)
    30:4;48:15
assume (2)
    3:16;4:22
assuming (4)
    14:12;17:23;21:1;
    47:23
attention (1)
    8:7
attorney (1)
    3:20
availability (2)
    7:13;25:5
available (1)
    18:11
aware (2)
    14:13;52:12

away (2)
    29:22;49:13

**B**

baby's (1)
    10:19
back (22)
    8:7;28:11;29:5;30:9;
    36:5,9,24;37:4,14;40:4,
    15;41:6;42:17;43:6,13,
    18,19;45:2,20;48:10;
    50:4;51:3
Based (4)
    13:23;27:1;44:18;
    46:24
basically (1)
    24:14
bathroom (1)
    4:14
beard (2)
    42:6;43:25
bedroom (3)
    36:9,14;50:15
beforehand (1)
    18:25
began (1)
    26:14
beginning (1)
    50:14
behavior (1)
    25:4
behind (8)
    31:16,21;35:2;38:4,
    14;41:18,22;46:23
best (2)
    4:19;33:4
birth (1)
    19:22
bit (3)
    12:3;27:8;44:22
bitch (1)
    46:17
bits (1)
    7:19
black (1)
    19:23
blurry (1)
    36:23
body (4)
    27:9;29:22;43:20;
    51:22
bodycam (1)
    21:1
body-worn (2)
    7:6,8
both (1)
    35:17
bottom (1)
    30:11
brain (1)
    9:17
break (3)

    4:12,13,16
brief (1)
    9:23
Brittney (5)
    8:18,21;10:14,21;
    12:6
building (1)
    24:15

**C**

call (2)
    13:17;47:9
called (1)
    3:7
cam (1)
    51:23
came (5)
    32:12,20;46:5;51:15,
    21
camera (10)
    7:6,8;27:10;30:10;
    35:24;36:3;37:1;43:20;
    50:12,16
can (16)
    13:15;16:2;19:14;
    22:24;29:2,4,19;30:24;
    31:6,18,25;36:18,21;
    38:4;44:1;46:13
capable (1)
    39:25
capacity (1)
    9:11
carry (1)
    49:8
case (3)
    5:3,5;6:15
Cause (17)
    6:11;7:9,24;8:3;
    10:18;21:13,24;26:19,
    20;27:2;28:3,6,12;
    45:17,23,25;46:11
causes (1)
    9:17
cell (4)
    36:22;37:18;45:5,8
certain (1)
    5:10
chance (2)
    23:18;28:10
charge (1)
    44:12
charges (1)
    49:14
Chase (1)
    42:9
Checking (1)
    19:17
chief (1)
    48:22
child's (1)
    10:19
clarify (2)

    4:5;31:7
clarity (1)
    30:24
clear (4)
    4:2;30:2;39:13;
    40:24
clearer (1)
    36:25
clears (1)
    37:9
close (1)
    21:9
closed (1)
    21:6;23:14,20;51:6
closer (1)
    33:17
closes (2)
    27:19;30:12
closing (1)
    23:16
color (1)
    12:4
coming (9)
    29:13;32:3;34:13;
    41:15,21;44:15,17;
    49:6;51:14
comment (2)
    15:24;47:13
comments (2)
    10:20;52:13
commit (1)
    23:3
committed (3)
    23:1;33:22;38:1
communications (1)
    15:10
community (1)
    25:8
complaint (1)
    8:9
complaints (2)
    8:13,23
complete (1)
    5:23
complex (1)
    51:20
concern (1)
    41:21
concerned (3)
    9:24;10:2;40:19
concerning (1)
    13:24
concluded (1)
    52:22
conclusion (1)
    16:13
confer (1)
    49:3
conferred (2)
    48:21,23
confirm (4)
    9:2;13:11;17:21;
    45:8

STATE OF INDIANA V.
LANZELL WILLIAMS, III

JONATHAN SNODGRASS
April 8, 2022

confirming (1)
17:19
confronted (1)
11:24
confronting (4)
10:25;12:11;13:10;
17:14
Conner (3)
33:6;42:12;46:20
consent (1)
22:11
consistent (1)
14:22
constitutional (1)
6:3
contact (3)
17:7,10,13
contain (1)
29:12
contained (1)
13:22
continue (5)
27:24;28:16;33:8;
35:7;41:14
continuing (1)
49:8
controlling (1)
33:14
conversation (1)
43:10
convicted (1)
49:21
copies (1)
11:14
cops (1)
34:14
copy (2)
12:25;13:9
corrected (2)
21:23;28:11
corrections (1)
7:23
corroborate (1)
20:2
corroborated (1)
19:15
counties (2)
19:12;49:15
County (2)
16:8,22
court (6)
6:12,14,14,22;25:19;
30:19
cover (1)
24:14
coverage (1)
7:9
covered (1)
20:21
crime (5)
15:4,9,13;23:1;33:22
criminal (2)
10:3;23:3

cuff (1)
41:12
cuffed (2)
42:21,25
currently (1)
44:9
custody (3)
34:7;39:1;41:25

**D**

danger (1)
25:6
dangers (1)
21:19
dark (1)
37:7
database (2)
17:22;19:24
date (4)
8:8,11,21;19:22
Dave (2)
3:20;42:22
David (2)
3:11,12
day (5)
7:5,5;12:14;18:18;
50:4
deal (1)
29:14
dealing (1)
25:2
dealings (4)
9:10,23;21:17;22:6
death (2)
10:19,19
decided (1)
25:19
decision (2)
48:19;49:4
decorations (1)
20:21
de-escalate (4)
34:1,4,5,6
Defendant's (4)
12:2;13:14;18:4;
19:5
defending (1)
49:6
Delaware (2)
16:8,22
Department (8)
5:16;6:9,24;17:7;
22:22;39:18;41:2;
52:14
depict (1)
15:15
DEPONENT (1)
53:4
deposed (1)
3:14
deposition (3)
4:1;5:2;52:21

deputy (1)
16:17
despite (1)
4:18
detail (1)
19:14
detain (2)
23:2;38:18
detained (2)
38:20;39:1
Detective (1)
45:7
different (3)
19:12;29:2;31:3
DIRECT (2)
3:3;41:22
directly (1)
17:19
disagree (1)
51:24
dispatch (9)
13:11,17,23;17:13;
18:16;19:17,21;21:1;
47:9
documents (1)
12:13
done (1)
34:8
door (34)
16:18,19;20:10,15,
17,19,24;21:5,6,9,14,
21,22;23:13,13,17,20,
23;24:1,3;25:24;27:15,
19,21;30:12;32:11,12;
33:1;35:13;38:11;51:6,
9,14,15
doors (2)
24:9,11
doorway (1)
16:20
down (15)
11:22;12:10;14:4;
26:21;27:4;29:16;
30:11,15;43:22;44:5;
46:1;49:9,12;50:8,9
Drop (2)
28:18;44:1
Due (3)
21:13,19;33:25
during (2)
26:8;29:8
dwelling (2)
22:25;23:7

**E**

earlier (1)
17:23
Eaton (2)
5:16,17
effect (6)
13:12;16:15;19:18;
26:20;27:2;28:7

effective (2)
14:6;18:22
eight (1)
14:4
either (7)
4:21;7:23;9:1;12:13;
21:24;24:1;36:13
elapsed (1)
50:7
else (3)
26:6;39:9;41:8
employed (3)
5:15,18,21
EMTs (1)
48:15
encrypted (1)
7:14
end (1)
24:12
Enforcement (5)
5:25;9:10,23;20:14;
22:6
enough (1)
23:21
enter (3)
19:2;22:11;23:13
entered (7)
18:25;22:14;26:11,
14;27:6;30:6;50:23
entering (1)
21:18
entirety (1)
7:18
entrances (1)
24:15
entry (1)
7:20
Errata (1)
53:11
erratic (1)
25:4
escalated (1)
25:10
even (13)
4:6;15:10;21:6;
34:17;36:14;37:25;
42:1;48:12;49:2,11;
50:4;51:1,22
event (2)
11:21;47:15
events (1)
25:11
eventually (1)
21:5
everybody (1)
47:21
everybody's (1)
47:22
evidence (1)
32:25
exactly (1)
4:7
EXAMINATION (1)

3:3
execute (1)
26:2
Exhibit (5)
13:14,16;18:4,13;
19:5
exited (1)
32:11
exits (1)
24:15
experience (2)
20:14;39:3
extended (1)
29:22

**F**

face (7)
29:11;39:22;46:17;
47:20,20,22;50:20
fact (3)
16:14,16,18
factors (2)
19:21;21:19
facts (1)
5:10
fair (3)
4:24;35:20;48:2
fairly (1)
36:23
fake (1)
48:3
false (3)
6:21,23;7:2
familiar (1)
25:12
far (3)
19:22;34:16;52:6
fear (1)
44:13
feel (3)
4:12;11:6;34:11
felon (1)
49:19
felony (2)
38:1;49:21
female (2)
19:22,23
few (3)
4:1;50:10,18
file (1)
7:25
filed (2)
6:12;25:14
finally (2)
4:18;46:9
find (5)
4:10;17:8,14;48:10;
49:16
fine (2)
49:5,8
finger (2)
28:19;44:2

STATE OF INDIANA V.
LANZELL WILLIAMS, III

JONATHAN SNODGRASS
April 8, 2022

**fingers (1)**
32:3
**finish (1)**
21:7
**firearm (15)**
29:9,16;33:23;34:12,
18;36:15;39:20,21,23,
24;44:7;47:5;49:1,2;
52:10
**firearms (4)**
25:5,15,16;34:22
**firing (1)**
39:25
**First (8)**
3:19;4:1;5:10;13:15;
22:3;30:20;32:12;46:5
**five (1)**
14:4
**flashing (1)**
31:18
**flush (1)**
21:9
**focus (1)**
41:24
**focused (1)**
35:15
**folded (1)**
13:5
**follow (1)**
12:17
**follow-up (4)**
11:2,10;13:2;16:21
**forever (1)**
50:21
**formed (1)**
9:12
**forward (1)**
27:12
**found (1)**
26:6
**frame (2)**
21:10;31:11
**free (3)**
4:12;11:7;48:17
**freely (3)**
48:9;51:15,16
**fresh (1)**
21:13
**front (3)**
24:3;29:14;38:11
**froze (1)**
25:9
**fully (1)**
21:21
**further (2)**
52:16;53:4

**G**

**gaslight (1)**
34:3
**gave (2)**
18:24;19:22

**given (2)**
3:16;18:15
**glare (1)**
42:7
**goes (2)**
36:8,9
**gosh (1)**
6:2
**grab (1)**
51:16
**grabbed (2)**
26:22;52:5
**grabbing (1)**
51:23
**ground (2)**
38:19;46:23
**guilty (1)**
15:17
**gun (39)**
25:21,23;28:18;
29:18;30:14;32:6,6,10,
12,15,20;36:10,21;
37:19;38:6,16;39:6,8,
11,13,15;40:16,20,22;
42:2;44:1,23;45:12,20,
20,25;46:5;48:13;49:8,
12;50:8,9,17,20
**gun's (1)**
39:17
**guys (1)**
40:8

**H**

**hallway (6)**
26:22;27:4;33:5;
36:7;43:22;46:5
**hand (21)**
28:21,22,23,24,25;
30:16,17,21;31:6,24;
32:7,8;33:14;37:6,12,
13,17,18;44:24;47:8;
50:17
**handcuffing (2)**
41:19;42:11
**handcuffs (1)**
39:2
**handle (1)**
23:12
**hands (2)**
33:20;36:22
**happened (3)**
20:3,4;44:7
**happens (1)**
21:4
**harassment (1)**
15:16
**hard (1)**
12:3
**hateful (1)**
10:14
**head (3)**
16:6;21:16;47:18

**hear (10)**
10:17;28:18;42:15;
43:3,8;46:3,6,13;
47:11;52:8
**heard (3)**
4:23;45:15;47:15
**hearing (1)**
49:6
**hears (1)**
44:15
**Hey (3)**
21:7;27:18;46:10
**hidden (1)**
37:23
**high (1)**
35:6
**hired (1)**
3:20
**history (2)**
10:3;25:2
**holding (1)**
47:5
**home (4)**
24:23;26:11,14;
49:23
**honestly (3)**
4:24;29:1;36:6
**hospital (1)**
51:2
**hostile (1)**
34:21
**hot (4)**
22:15,18,21,24
**hour (2)**
50:23;52:14
**house (24)**
16:9;17:18,19;19:16;
20:7,7,8;22:11,15;23:9,
13;26:4,15;30:4;36:5;
39:9;40:11,13,20;
48:10,17;50:23;51:4,
24
**hundred (1)**
14:12
**husband (3)**
26:17,23;27:5

**I**

**ID (1)**
9:2
**idea (3)**
34:15;37:25;45:12
**identification (4)**
12:2;13:14;18:4;
19:5
**identified (1)**
36:10
**identify (3)**
9:1;13:16;42:5
**identifying (1)**
19:21
**immediately (4)**

21:6;24:6;32:20;
44:14
**important (3)**
4:2,5;14:25
**incarcerate (1)**
23:2
**incidences (1)**
12:21
**incident (2)**
7:15;17:5
**included (1)**
13:25
**inconsistent (1)**
40:25
**Indiana (3)**
5:25;13:12;25:12
**indicated (1)**
10:13
**information (8)**
6:19;8:17;13:21;
14:8;16:16;17:25;
18:11;19:3
**inhaler (2)**
48:6,10
**injured (1)**
35:6
**injury (1)**
9:17
**ink (1)**
12:4
**Insight (5)**
13:12;14:14;17:22;
18:10;19:6
**intent (1)**
15:4
**intentionally (2)**
6:23;34:12
**interrupt (1)**
4:6
**intimidate (1)**
49:2
**intimidation (2)**
15:17;44:12
**into (9)**
7:20;22:25;23:6;
24:23;34:7;39:1;41:24;
44:17;51:3
**introduce (1)**
3:19
**invasion (6)**
15:3,20;26:21;27:3;
28:8;45:17
**involves (1)**
44:12
**issue (2)**
9:16;29:14
**issued (2)**
14:17;15:11
**issues (2)**
6:9;9:18

**J**

**Jayda (15)**
8:9,11;10:6,11,21;
12:7;13:3,5,19;14:6,
21;15:22;16:16;17:18;
19:14
**Jayda's (2)**
20:7;30:4
**jibe (1)**
20:25
**job (1)**
5:24
**Jonathan (3)**
3:6,8;53:9
**July (8)**
5:21;7:6;8:8;9:6,19;
18:20,21,22
**jump (1)**
16:13
**juvenile (2)**
35:2,5
**juveniles (1)**
38:14

**K**

**keep (3)**
37:2;38:8;43:4
**kept (1)**
35:3
**kick (3)**
46:16;47:18,22
**kind (2)**
29:14;35:3
**kitchen (2)**
36:8,13
**Knepper (1)**
42:9
**knew (3)**
12:24;13:3;16:24
**knock (1)**
30:10
**knocked (5)**
20:10,24;21:5;23:10;
51:8
**knocking (1)**
27:15
**knowingly (1)**
15:6
**knowledge (7)**
8:25;15:2,5,14;
16:12;25:4;47:14
**known (1)**
9:16

**L**

**Laird (1)**
25:12
**Lanzell (33)**
3:21,24;9:19,22;
26:17,23;29:8;31:21;
33:17,20;35:3,9,15;
36:18;38:4,11,20;

40:21;41:12,18;43:1,
22;44:14,22;45:19;
47:11;48:9,17,20;
50:22;51:3;52:4,13
**lascivious (1)**
10:20
**last (1)**
4:15
**Later (1)**
45:23
**Law (6)**
5:25;9:10,23;20:14;
22:6;25:12
**lawful (2)**
44:14,18
**laws (1)**
15:15
**learned (2)**
40:25;41:1
**leave (3)**
26:4;36:7;40:11
**leaving (1)**
11:21
**left (8)**
17:18;25:8;28:22;
30:21;31:5,24;32:7;
37:6
**level (3)**
18:1;32:1;52:8
**lewd (1)**
10:19
**light (2)**
31:18;41:7
**line (2)**
49:5,8
**lines (1)**
14:4
**little (5)**
12:3;27:8;36:25;
42:19;44:22
**living (1)**
4:19
**long (4)**
5:18;6:1;50:14,19
**longer (3)**
39:7;47:4;50:17
**look (6)**
11:18,20,23;13:7;
18:13;50:4
**looking (2)**
30:11;31:9
**looks (4)**
19:11;20:24;31:9;
41:17
**lot (1)**
21:16
**lower (2)**
32:19;46:9
**lowered (5)**
32:16,21;34:9,14;
46:11
**lowers (1)**
32:15

# M

**main (1)**
41:24
**makes (1)**
40:8
**manners (1)**
15:16
**many (4)**
14:13;23:25;24:17;
50:7
**March (1)**
5:19
**mark (1)**
13:13
**marked (4)**
12:2;16:4;18:3;19:4
**match (2)**
18:14;32:2
**may (3)**
5:10,11;30:18
**maybe (1)**
36:24
**mean (1)**
16:1
**meaning (1)**
34:5
**means (1)**
22:24
**meant (2)**
16:7;17:1
**medical (1)**
9:16
**meet (1)**
8:18
**memory (1)**
7:15
**mental (2)**
9:12,25
**mentally (1)**
25:15
**mentioned (1)**
17:22
**mentions (1)**
14:4
**Michael (1)**
42:12
**middle (3)**
3:10;31:10;33:18
**might (2)**
36:25;40:17
**might've (1)**
15:17
**mind (1)**
45:9
**mistake (1)**
21:15
**moment (6)**
26:2;33:5,24;34:11;
43:15;44:7
**more (5)**
34:10;35:16;36:25;

38:25;42:19
**move (3)**
38:4;39:3,13
**moved (1)**
38:11
**moving (1)**
38:8
**much (1)**
40:19
**mul (1)**
49:11
**Multiple (4)**
9:10;16:14;49:12;
52:13
**mycourtsINgov (1)**
18:9
**myself (1)**
3:19

# N

**name (4)**
3:4,10,19;14:11
**narrative (3)**
5:6,9;43:23
**nature (1)**
33:25
**need (4)**
4:12,14;5:11;49:3
**needed (3)**
23:22;33:20;49:25
**neutralize (1)**
34:17
**Nods (1)**
16:6
**noise (3)**
44:18;46:7,14
**noises (1)**
49:6
**notations (1)**
53:10
**note (1)**
14:1
**notes (5)**
11:4,6;13:17,17,23
**nothing's (1)**
25:19
**notification (1)**
44:16
**number (1)**
18:14

# O

**oath (1)**
8:4
**obtain (2)**
25:9;51:11
**obtained (1)**
25:7
**obtaining (2)**
21:18;24:23
**obvious (1)**

49:4
**occur (1)**
25:6
**occurred (3)**
7:15;12:15,21
**off (5)**
21:2;31:19,20;43:15;
51:18
**Office (3)**
16:8;25:18;48:22
**Officer (21)**
3:8;28:18;29:24;
30:2;31:14;33:4,6,8,13,
23;37:2;40:3;41:11;
42:5,10;43:19,25;44:4,
11;45:7;46:20
**officers (18)**
18:24;19:2,2;24:14,
17;25:7;8;33:13,13;
38:5,19;46:8;47:12;
48:21;51:8,16,23;52:8
**often (1)**
25:11
**once (1)**
34:13
**one (11)**
7:13;13:12;14:20;
19:14,25;24:8;44:11;
46:16;47:8,8,21
**only (3)**
3:23;4:15;12:9
**open (2)**
27:21;35:13
**opened (4)**
21:5,10;25:24;51:14
**opens (1)**
30:12
**opinion (2)**
9:12,15
**opposite (1)**
34:5
**order (24)**
10:6,9;12:15,22,25;
13:6,9,25;14:7,16,21;
15:2,5,5,10,23;16:15;
17:11,15,20;18:1,14,
15;19:18
**ordered (4)**
26:15;40:13,15;49:9
**originally (1)**
51:8
**others (1)**
24:19
**out (23)**
4:9,10;10:22;17:8,
14;26:15;29:22;32:12,
20;33:1;34:13;35:3;
40:13;41:22;44:15;
45:20;46:5;49:6,15,16;
50:15;51:2,24
**outreached (1)**
32:1
**outside (8)**

10:17;20:6;23:6,9;
51:15,16,17,21
**over (6)**
9:24;10:2,6;26:8;
31:16;40:21
**own (1)**
40:13
**owning (1)**
25:4

# P

**page (1)**
19:8
**papers (2)**
16:18,19
**paperwork (2)**
13:5;25:18
**parallel (1)**
24:6
**part (5)**
5:3;21:15;41:8;
51:18
**pausing (1)**
41:17
**peephole (1)**
20:19
**people (3)**
9:1;34:21;49:3
**perceived (1)**
21:20
**percent (1)**
14:12
**permit (3)**
49:25;50:2,5
**perpendicular (1)**
24:8
**person (2)**
17:13;47:21
**personally (1)**
19:8
**petition (1)**
25:14
**petitioner (1)**
10:11
**phone (5)**
37:18;45:5,8;50:16,
17
**phones (2)**
36:22;47:7
**photo (1)**
9:2
**physically (2)**
29:15,18
**pick (1)**
37:1
**picked (1)**
39:8
**picture (3)**
18:5;30:14;36:18
**pieces (1)**
7:19
**placed (1)**

STATE OF INDIANA V.
LANZELL WILLIAMS, III

JONATHAN SNODGRASS
April 8, 2022

16:18
play (5)
27:8;33:8;37:8;
42:19;45:2
playing (3)
27:24;30:19;37:2
plays (30)
28:1,17;29:7;30:13;
33:11;35:8,19,23;
36:17;37:3,16;38:3,9;
40:2,7;41:5,10,16;42:4,
14,20;43:5,7,17,24;
44:10,21;45:3,14,22
please (2)
3:4;4:20
pm (2)
3:1;52:21
point (35)
14:20;19:14;27:18,
25;28:19;29:8,9,25;
30:9,24;32:9,16;33:12,
19;34:9,10;35:1,15,20;
37:1,12,19;38:10,18;
39:1,7;40:16;44:4;
45:11,16,19;46:16;
47:24;48:12,19
pointed (6)
29:16,18;34:12;
36:14;49:1,2
pointing (8)
28:22;30:20;31:1,5;
32:25;33:22;44:2,6
pointings (1)
31:3
points (1)
32:10
Police (12)
5:16;6:24;7:3,10,24;
8:4;26:11;28:12;39:18;
41:2;44:16;45:24
popping (1)
35:3
posed (1)
4:16
positioned (1)
29:13
possess (2)
49:14,17
possessing (1)
25:5
possession (2)
25:23;39:17
possibility (1)
35:5
possible (2)
34:2,7
possibly (3)
21:20;40:20;42:1
potentially (2)
25:9;40:22
prefer (1)
3:7
preference (1)

3:9
prepare (2)
6:11,24
presence (1)
23:4
presented (1)
6:22
prevented (1)
24:22
previous (4)
20:14;21:17;22:6;
25:2
principles (1)
6:4
prior (14)
5:1,23;7:9;9:6,19;
10:24;12:10;13:18;
17:14;23:16;27:3;
32:11;44:14;52:14
privacy (6)
15:3,20;26:21;27:3;
28:8;45:17
Probable (16)
6:11;7:9,24;8:3;
21:13,24;26:19,20;
27:2;28:2,6,11;45:17,
23,24;46:10
probably (5)
4:6,8;16:3;32:23;
35:16
problem (1)
43:13
procedures (1)
6:6
process (1)
21:17
processes (1)
21:18
profession (1)
3:17
property (2)
23:1;49:7
prosecutor's (2)
25:18;48:22
protect (1)
34:13
protective (22)
10:6,9;12:15,22,25;
13:6,9,25;14:7,21;15:2,
5,10,22;16:14;17:11,
15,20;18:1,14,15;19:18
proven (1)
9:16
psychological (1)
9:17
public (1)
26:6
pull (1)
51:17
pulled (1)
26:8
pulling (1)
51:23

purposes (4)
12:2;13:14;18:4;
19:5
pursuit (6)
21:13;22:15,19,21,
24,25
push (1)
35:13
put (6)
33:19;45:20,25;
49:12,12;50:8
putting (2)
44:12;49:9

Q

quick (1)
43:14
quickly (3)
34:2,6;48:5
quite (1)
25:11
quote (2)
21:13;26:19

R

raised (1)
32:13
ran (1)
19:25
rather (1)
48:5
reached (1)
21:22
read (2)
10:24;12:3
reading (1)
14:3
real (1)
43:14
realized (1)
34:14
rear (1)
24:5
reason (7)
9:24;10:2,5;21:12,
23;22:1;51:24
reasons (1)
16:14
recall (2)
43:10;52:9
receive (2)
11:17;22:18
received (4)
12:21,24;13:18;
22:21
receiving (1)
11:11
recess (1)
43:16
recognize (3)
18:5;19:6;27:9

record (9)
3:5;5:12;16:4;27:13;
31:19,20;43:15,18,20
recording (1)
47:8
recovered (2)
52:10,12
refer (2)
5:11;11:4
referring (5)
5:13;14:7;42:22;
46:22;47:17
reflect (1)
11:6
refused (1)
51:8
regarding (2)
11:2;34:21
registered (1)
34:19
Registry (1)
18:1
remember (6)
5:10;15:24,25;36:8;
41:11,13
repeat (1)
4:21
rephrase (1)
4:21
replica (1)
39:23
report (11)
5:5,8,11,13;6:25;
7:14,17;13:22;19:25;
21:24;28:12
reporter (1)
30:19
reports (6)
7:3,10,24,25;8:4;
12:6
represent (2)
3:23,24
requested (1)
16:15
residence (6)
7:21;9:4;20:11,13;
21:19;27:6
resist (1)
52:4
resisting (3)
35:20;46:22;52:8
respond (2)
8:8;43:2
responded (1)
16:11
respondent (2)
10:12;14:5
responding (1)
46:25
response (1)
47:1
result (1)
44:13

retreated (1)
23:6
review (2)
5:1;28:10
reviewed (2)
6:17;29:24
rewind (1)
45:1
right (71)
3:16,18;5:1,15;7:15,
20;8:7,18;12:1,13,17,
20;14:25;15:8;18:13;
19:11;20:6;21:9;22:14,
18;24:6;26:2;27:12,24;
28:10,21,23;29:21;
30:17,18;31:8,16,24;
32:6,7,8,15,18,23,24;
33:12,18;35:12,13,17,
21;36:1,18,21;37:11,
11,13,18;38:4,8,10;
42:8,19;43:18,19;
45:19;46:21;47:1,4,7,
11,16;48:2;49:7;50:12;
52:3
right-hand (1)
44:5
room (1)
37:22
round (1)
39:25
rules (1)
4:1
run (1)
26:21
running (1)
27:4

S

SAITH (1)
53:4
same (4)
18:10,15;19:6,9
saw (5)
15:23;22:3;32:3;
44:4,22
saying (9)
10:18;21:7;28:18;
31:1;42:24;44:1,6;
46:19;47:1
scene (5)
25:9;40:22;44:17;
48:15;51:3
scream (1)
26:15
screaming (4)
26:22;27:4;44:15;
46:7
second (1)
37:8
seconds (7)
32:18;37:4,14;45:2;
50:7,10,18

STATE OF INDIANA V.
LANZELL WILLIAMS, III

JONATHAN SNODGRASS
April 8, 2022

Seeing (1)
32:23
seems (1)
50:20
SEITER (12)
3:3,20;16:4;29:6;
30:25;31:4,7,18;43:15,
18;52:16,19
seize (2)
25:16;39:15
seizure (2)
47:25;48:3
serious (1)
49:19
served (12)
13:4;14:17,22,25;
15:8,23;16:11;17:11,
16,20;18:19,21
service (5)
12:21;17:21;18:23,
25;20:4
set (1)
6:15
seven (1)
14:4
sheds (1)
41:7
Sheet (1)
53:11
sheriff (5)
15:24;16:22,24;17:4,
10
Sheriff's (3)
16:8,17;17:7
shortly (2)
41:15;50:11
shoulder (2)
31:17;32:1
show (10)
12:1;13:13;16:2;
18:3,18;19:4;29:2,5,
19;43:21
showing (1)
29:21
shows (1)
51:23
shut (3)
21:21,22;23:23
shutting (1)
21:14
side (10)
24:3,4,8,11;29:17;
30:15;44:6;50:9;51:19,
19
sides (1)
23:25
signature (2)
52:19,20
significant (1)
33:25
site (1)
18:2
situation (3)

34:1,6,21
six (1)
14:4
skip (1)
27:12
SNEED (8)
16:6;29:4;30:24;
31:1,5;48:23;52:18,20
Snodgrass (4)
3:6,7,8;53:9
solid (1)
20:15
somebody (4)
16:7;18:25;44:13;
47:24
somewhere (2)
26:6;37:23
sorry (6)
12:7;18:22;34:3;
42:7;47:20;50:16
sounds (1)
42:21
Sparks (4)
8:19,21;10:14;12:7
speak (1)
10:5
speaking (1)
13:19
specific (1)
15:4
specifically (1)
51:22
spells (1)
14:11
start (2)
27:14;43:21
state (2)
3:4;21:12
stated (2)
11:17;26:20
statement (2)
26:23;27:1
statements (10)
6:21,23;7:2;10:22,
24;11:3,11;12:8,9;13:1
states (2)
26:19;47:25
status (2)
9:13,25
step (3)
23:9;40:3,15
still (11)
15:15;35:9,15;36:22;
39:2,11;42:1;48:12,17;
49:16;51:3
stillshot (1)
31:9
stop (3)
26:8;30:23;36:19
stopped (8)
21:14;31:8;35:25;
38:5;41:7;44:23;45:15;
48:7

stopping (1)
38:10
Storie (4)
30:2;33:4;40:3;
41:11
Storie's (6)
29:24;33:8;37:2;
44:5;45:7,7
story (1)
19:15
Subject (1)
53:10
submit (1)
25:17
submitted (1)
25:18
sued (1)
40:9
suing (1)
52:14
supplemental (1)
7:25
supposedly (1)
36:14
Sure (17)
4:11,17;5:12;10:21;
12:5;29:6;30:25;31:7;
33:2,6,10;35:1;36:6;
39:23;49:13;51:18,20
surrounding (1)
25:8
suspect (3)
22:25;23:2,19
sworn (1)
3:1
system (1)
7:14

T

talk (1)
23:22
talked (2)
30:18;31:2
talking (4)
31:2;42:25;48:7;
50:14
teach (2)
6:3,6
telling (1)
40:3
tells (3)
14:16;35:24;50:11
ten (2)
37:4,14
testimony (3)
8:5;14:22;29:15
theory (1)
22:15
thinking (2)
34:15,16
though (9)
4:6;15:10;29:11;

34:18;36:14;37:2;38:1;
42:1;48:12
thought (4)
21:17;28:9;45:8;
49:1
threat (11)
34:17,19,23,24;35:5;
36:11;37:25;39:4,6,7;
40:8
threatening (3)
15:15;44:13;47:21
threats (1)
47:12
threat's (1)
39:11
three (1)
24:20
Tiffanie (38)
3:23;9:3,6,9;10:11,
13,17,25;11:24;12:7,
11;13:3,10;14:10;
17:14;18:18;19:24;
20:6;21:17;22:7;24:24;
25:2,10;26:14;27:13;
31:10;33:14,17;35:16;
38:19,25;40:19;41:19,
24;42:11;46:22;47:24;
51:1
Tiffanie's (9)
16:9;17:2,8,19;
19:16;20:7;23:25;30:6;
35:20
Tiffany (4)
14:5,13;19:11,19
til (1)
25:9
times (1)
49:12
timestamp (1)
30:10
today (4)
4:10;5:2;8:5;14:23
told (10)
13:6;28:5,7;45:24,
25;46:6,9;49:11,12;
50:8
torso (3)
31:10,13,21
total (1)
24:20
totality (1)
11:8
totally (1)
13:23
towards (1)
38:11
Town (1)
5:16
traffic (1)
26:8
train (1)
34:20
training (5)

6:8;22:18,21;39:3;
41:1
transported (1)
51:2
traumatic (1)
9:17
trick (1)
29:3
tried (2)
25:17;26:21
true (1)
26:24
trying (5)
21:16;29:2,12;34:1,3
tunnel-vision (1)
21:20
turn (5)
8:7;23:12;28:3,5;
29:11
two (10)
7:14;11:4,5;24:2,14,
19;31:2;33:13;38:19;
47:7

U

uh-uh (1)
4:4
unaware (1)
13:4
unborn (1)
10:19
under (3)
8:4;22:15;23:17
understood (2)
4:23;36:24
uniform (2)
26:10;32:23
unlawful (1)
47:2
unstable (1)
25:15
up (21)
12:17;18:14;20:21;
21:7;24:9;27:19;29:20;
30:9;32:2;37:1,4,5,9,
14;39:8;41:12,15;
42:22,25;45:2;51:14
updates (1)
6:8
use (1)
4:14
used (2)
12:4;17:23
usually (1)
3:10

V

vantage (1)
29:24
verify (2)
17:10;50:2

**versus (1)**
21:18
**video (67)**
8:1;11:15,18,23;
14:20;16:1;20:25;27:8,
14;28:1,10,15,17;29:7;
30:13,19;31:8;32:2,25;
33:3,7,9,11;34:9;35:1,
8,19,23,25;36:17,25;
37:2,3,16;38:3,5,6,9;
40:2,7;41:5,6,10,16;
42:4,14,20;43:5,7,14,
17,20,24;44:10,19,21,
23;45:3,7,7,14,15,22;
46:14;49:11;51:22,23
**view (2)**
33:4;51:20
**violate (1)**
15:6
**violation (1)**
12:14
**violent (1)**
49:19
**visible (2)**
20:19;38:16

**W**

**Wait (2)**
11:14;49:10
**waited (1)**
26:4
**walk (3)**
4:13;48:9,17
**walked (3)**
20:7;41:18,18
**walking (2)**
40:21;41:22
**walks (1)**
37:5
**warrant (7)**
6:6;21:18;22:7;
24:23;25:10;26:1;
51:11
**watch (4)**
7:13,20;35:7;41:14
**watched (5)**
7:8,16,18,19;28:15
**watching (6)**
7:25;28:16;34:8;
35:16;43:4;45:6
**water (1)**
4:13
**way (3)**
14:15;25:3;29:13
**weapon (7)**
32:19;34:9,14;46:9,
11;49:14,17
**weapons (3)**
25:5,6,7
**wear (2)**
7:5,6
**website (3)**

18:5,10;19:7
**what's (4)**
18:3;19:4;21:7;
27:18
**WHEREUPON (1)**
52:21
**white (1)**
19:22
**whole (1)**
4:9
**wife (4)**
34:13;44:15;47:2;
49:6
**Williams (32)**
3:21,23;8:9,11;9:7,
20;10:6,11,13;11:24;
12:7;13:10,19;14:5,6,
10,13;17:14;18:19;
19:12,19,24;22:8;
24:24;25:2;26:23;29:9;
31:10,22;40:20,21;
44:14
**Williams' (4)**
7:21;9:3;17:18;
19:15
**window (1)**
24:1
**windows (3)**
20:17;24:9,11
**within (1)**
32:18
**without (1)**
17:19
**Witness (2)**
3:1;12:8
**woman (2)**
21:5;22:2
**word (1)**
17:1
**words (2)**
15:3;47:16
**worried (2)**
38:25;40:21
**wound (1)**
51:14
**write (3)**
10:21;28:6;45:23
**writing (1)**
7:9
**written (4)**
6:24;7:17;10:22;
12:9
**wrote (2)**
5:5;22:14

**Y**

**year (1)**
5:19
**years (3)**
5:20;11:5,5
**yell (2)**
26:15,17

**yelling (6)**
10:14,17;35:9,12;
46:4,8

**1**

**1 (1)**
3:1
**10 (1)**
45:2
**10:58 (1)**
30:11
**10-second (1)**
29:4
**10th (2)**
18:20,21
**11:17 (1)**
31:8
**11:55 (1)**
36:19
**12 (1)**
11:22
**12:19 (1)**
38:5
**12:26 (1)**
38:10
**13:06 (1)**
40:8
**13:54 (1)**
41:17
**17 (1)**
7:6
**17th (5)**
5:21;8:8;9:6,19;
18:22
**1999 (1)**
6:2

**2**

**2:00 (1)**
52:21
**20 (1)**
37:15
**2000 (1)**
6:2
**2020 (4)**
5:21;7:6;8:8;9:19
**22:14:45 (1)**
16:5
**22:25:15 (1)**
20:25
**22:25:25 (1)**
27:14
**22:25:51 (1)**
43:21
**22:26 (1)**
44:9
**22:26:51 (1)**
44:23
**22:26:52 (1)**
45:11
**22:26:57 (1)**

45:16
**23 (1)**
5:19
**26th (1)**
5:19

**3**

**3 (1)**
11:22

**6**

**6 (1)**
52:8

**7**

**7-10 (1)**
14:6

7/11/2022    Case 5:22-cv-01198-DSF-KS    Document 1    Filed 07/11/22    Page 59 of 59    Page ID
#:59
Fwd: Response Brief from the State - tsca84@gmail.com - Gmail

The lies told by Steve Sneed just do not end. I absolutely want my case preserved under SECTION 1983. This is an extremely grotesque. https://youtu.be/p7O11Fn59yI this is the incident with Brittney Sparks a non protected party. I NEVER made an indirect nor a direct threat to harm Jayda nor Aaliyaha. I STATED THE BEST THING THAT COULD HAPPEN WOULD BE HER MISSCARRYING AS THE BABY DESERVES BETTER. AN I STAND BEHIND THAT. AS OUR GRANDCHILD HAS ALREADY BEEN EXPOSED TO DRUGS ECT!! ALSO NOTICE I WAS INSIDE MY OWN HOME NOT IN FRONT OF JAYDA'S OH YA THE APARTMENT HER DAD AND I PAID FOR!

Also I was never served anything!! The Delaware County service record shows that. If you need me to resubmit that to any of you in this email I can do that!

Next an Sneed needs to get off his hard on for me and actually do his job!! Watch the body cam footage of Snodgrass https://youtu.be/DmJfBonESZE
He never ever looked at the protective order if that was what was even in jaydas hand it is a folded document that she places on the table.. again Sneed do your JOB

Now more importantly stop trying to protray me as crazy I am far from that!! EATON INDIANA OFFICERS NEVER EVER DEALT WITH ME FOR MAKING A THREAT TO KILL MYSELF. NOR WAS I EVER DETAINED BY ANY OFFICER FROM ANY DEPARTMENT FOR THAT MATTER FOR MENTAL HEALTH REASONS.

I WAS OK UNTIL MY ATTACK..

OFFICERS CANT JUST BREAK INTO OUR HOMES PERIOD IT IS A VIOLATION OF OUR RIGHTS. I MEAN CAN I COME AND ENTER ANY OF YOUR HOMES BECAUSE SOMEONE SAYS YOU MADE A THREAT AND I WANT TO TALK TO YOU? WELL NO I CANT ITS AGAINST THE LAW UNLESS IM A BITCH WITH A BADGE I GUESS 😦 I HAVE NEVER EVER BEEN KNOWN TO HANDLE FIREARMS RECKLESSLY I WAS A CCW HOLDER AS WAS MY HUSBAND. I MEAN JAMIE BROWN EATON OFFICER WHO WAS ARRESTED FOR DUI WAS GOING FOR HER GUN TO SHOOT STATE POLICE IN DECEMBER COULDNT FIND IT AS IT HAD FELL OUT OF HER PURSE UMM THATS WRECKLESS I CARRIED IN A HOLSTER ON MY SIDE THAT WAS FITTED FOR MY DIFFERENT WEAPONS.

I HAD NEVER EVEN SEEN MICHEAL CONNER VERIFIED VIA HIS BODY CAM FOOTAGE NOR HAD SNODGRASS OR STORIE EVER HAD ANY DEALINGS WITH ME EVER ON A PERSONAL LEVEL OR IN A PROFESSIONAL MANNER... THEY ARE COWARDS AND LIERS AND STILL DOESNT

Where is this in any of the police reports? Where are the corrected reports? Where is the hospital videos in the entirety? I would like to sit with my attorney and watch those step by step the hospital video with the body cam videos of Conner. I can tell you right where they are cut and sliced I'll never ever forget Skylar Brand telling me he was racist and he was going to cut the nig**r shit out of my head referring to my weave. I only made it thru page 2 of Unfit Sneeds reply and it's full of provable lies. Where is the justice and when will people even care!! This man broke into my home. My bones were broke ect. I was sexually assulted my life torn apart and still it continues cause Sneed is a cock sucking coward. If they never got my videos how were they in states evidence Humm if I was truly as insane as you attempt to cast me Sneed you wouldn't keep playing with my life!!! You made a mistake, your officers made a mistake vorhess made a mistake she stated on the bench May 2021 she could not JUDGE ME FAIRLY WELL IF YOU CANT JUDGE ME FAIRLY THEN YOU SURE AS IN THE HELL CANT JUDGE MY CO-DEFENDANT MY HUSBAND FAIRLY EITHER AFTER ALL SHE STATED SHE COULDNT JUDGE ME FAIRLY AS I MADE A STATEMENT ABOUT HER DAUGHTER I SAID WHAT VORHESS I DONT MATTER AS I DIDNT GET MY NECK SLIT OPEN LIKE YOUR DAUGHTER DID AT CENTRAL! I MEAM SHE FOUGHT FOR JUSTICE ECT WHEN HER DAUGHTER WAS THE ONE WHO WAS MAKING SEXUALLY ADVANCES TO HER ATTACKER AND SHE WAS MIND SCREWING HIM AND MOCKING HIM THRU SCHOOL... WELL DELAWARE COUNTY FOUND THEM SELF TO BE UNABLE TO CONTIUNE MY CASES!! AS IT IS A UNIFIED COURT SYSTEM WELL SNEED YOUR APART OF IT AND YOU WERE NAMED DROPPED IN THE VERY BEGINNING AND SHOULD NOT BE ON THIS CASE AS THE COP IN QUESTIONS FIANCÉ ALYSSA SORREL WORKS DIRECTLY IN YOUR OFFICE AND IS YOUR INVESTIGATOR!!! SPECIAL PROSECUTOR SHOULD OF BEEN DONE LONG AGO. JUST LIKE AN INVESTIGATION INTO THE ENTRY INTO MY HOME. ALSO MY HUSBAND SAID YOU TWIST HER ARM AGAIN ILL KICK YOU IN THE FUCKING FACE BITCH AS THAT TWIST IS WHAT BROKE MY BONES WHICH WAS NEVER EVER EVER LOOKED AT I HAD TO GO TO ANOTHER HOSPITAL DO TO MY ATTACK.. AS WELL SNODGRASS IS THE ASSITANT CHIEF AT IUBMH..

https://www.tiktok.com/t/ZTdo5WajN/?k=1